14CA1225 Peo v Townsell 04-05-2018

COLORADO COURT OF APPEALS

DATE FILED
April 5, 2018
CASE NUMBER: 2014CA1225

Court of Appeals No. 14CA1225
Arapahoe County District Court No. 13CR2039
Honorable Kurt A. Horton, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jamale D. Townsell,

Defendant-Appellant.

JUDGMENT AND SENTENCES AFFIRMED

Division VI
Opinion by JUDGE FOX
Furman and Ashby, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 5, 2018

Cynthia H. Coffman, Attorney General, Brock J. Swanson, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Krista A. Schelhaas, Alternate Defense Counsel, Littleton, Colorado, for Defendant-Appellant

¶ 1    Defendant, Jamale D. Townsell, appeals the judgment of conviction entered on jury verdicts finding him guilty of theft, two aggravated robbery counts, and two menacing counts.  We affirm.

## I.    Background

¶ 2    A masked man entered a bank lobby where two bank employees — K.K. and M.O. — were present.  The man, later identified as Townsell, yelled "nobody fucking move," jumped over the teller counter, pointed a gun at bank teller K.K., and demanded money.  He placed $1104 — containing a concealed global positioning system (GPS) device — from K.K.'s teller drawer into a bag hanging from his neck and shoulder.  Townsell then jumped over a counter and exited the bank.  The robbery lasted about twenty-eight seconds from Townsell's entry to his exit.  Townsell then entered a stolen car parked in the bank's parking lot and drove to a nearby apartment complex, where he abandoned the car.

¶ 3    Meanwhile, police officers tracking the GPS device contacted E.R., Townsell's wife, in her car.  In the trunk of her car, officers found a gun and one shoe.  In the middle of a nearby street, officers found a bag containing, among other things, a sweatshirt, a bandana, one shoe, money, the GPS device, a mask, a pair of

1

pantyhose, and gloves.  The police took E.R.'s cellular phone and obtained phone records showing that Townsell's phone called E.R.'s phone shortly before and after the robbery while the two phones were close to the bank and to each other.

¶ 4    Townsell was later arrested and charged with six counts: theft, possession of a weapon by a previous offender, aggravated robbery and menacing concerning K.K., and aggravated robbery and menacing concerning M.O.  At trial, Townsell denied participating in the robbery and offered evidence of an alternate suspect, E.R.'s brother.  The prosecutor offered evidence showing that Townsell's deoxyribonucleic acid (DNA) matched DNA found on the shoes, pantyhose, bandana, and mask seized by police.  A jury found Townsell guilty of theft, two aggravated robbery charges, and two menacing charges.

¶ 5    The trial court gave Townsell consecutive sentences of twenty-two years in the custody of the Department of Corrections (DOC) for aggravated robbery concerning K.K. and ten years for aggravated robbery concerning M.O.  The court also sentenced Townsell to six years in DOC custody for menacing K.K., two years

for menacing M.O., and eighteen months for theft, to run concurrently.

## II.  DNA Match Evidence: Statistical Significance

¶ 6    Townsell argues that the trial court plainly erred in allowing an expert to testify that Townsell's DNA matched DNA found on the shoes, bandana, mask, and pantyhose without requiring evidence of the match evidence's statistical significance.  We are not persuaded.

### A.  The DNA Expert's Testimony

¶ 7    The trial court qualified, without objection, a laboratory agent from the Colorado Bureau of Investigation as an expert in forensic DNA analysis.  The expert testified that, when conducting the subject forensic DNA analysis, she examined nuclear DNA — found on items including the shoes, pantyhose, bandana, and mask — focusing on sixteen locations in the DNA strand to create a DNA profile.  According to the expert, a person's DNA profile is unique (unless the person is an identical twin).

¶ 8    After creating the DNA profile, the expert stated that she conducts "comparisons between evidence samples and known samples.  If there is [a] matc[h] between those comparisons, I then may perform statistical calculations [or] analys[e]s to see how rare

3

that profile is or how often I would find that profile in the population." She then differentiates the rate of frequency of a DNA profile among "Caucasians, African-Americans, and Southwestern Hispanics" for greater accuracy. The following exchange occurred between the prosecutor and the expert:

> Q[.:] Are there DNA profiles that you can generate which are so unique that you are able to . . . identify who the contributor of the DNA actually is?
>
> A[.:] Yes. So we can get statistics that are very rare, and so low that we can call it source attribution[, which] means . . . if we get a statistic that is less than 1 in 300 billion, we can say that individual contributed that DNA, so they are the source from a DNA profile for that particular item.

¶ 9    The expert testified that she obtained

- a "partial profile" — meaning she obtained a DNA profile at thirteen of the sixteen locations in the DNA strand — from the left shoe;

- a full profile — meaning she obtained a DNA profile at all sixteen locations in the DNA strand — from the pantyhose sourced from a single person;

4

- a full profile from the bandana sourced from a single person;

- a "mixed" profile from the mask (a knit hat with two holes cut into it) — meaning multiple people (a major and a minor contributor) left DNA on the mask.  The expert obtained a full profile from the major contributor which was consistent with the profile from the left shoe, pantyhose, and bandana.  But, the expert was only able to obtain a partial profile — at three of the sixteen locations — from the minor contributor, which was insufficient to "make any interpretations" regarding the minor contributor; and

- a full profile from the right shoe sourced from a single person that "matched all the other profiles obtained."

¶ 10    After comparing Townsell's DNA profile to the profile found on the items, the expert concluded that Townsell's profile matched, and "is the source of," the DNA profile from the right shoe.  The expert also determined that Townsell's profile matched, and was the source of, the partial profile from the left shoe.  The prosecutor asked whether the expert was able to identify Townsell as the partial profile's source, and the expert responded, "Yes, I am.  I still

get a statistic that is more rare than 1 in 300 billion." The expert further concluded that Townsell's profile matched, and was the source of, the profiles from the pantyhose and bandana. His profile also matched the mask's major contributor's profile.

¶ 11 Defense counsel neither objected to this testimony nor disputed that Townsell's DNA was found on the items at issue.

### B. Preservation and Standard of Review

¶ 12 The parties agree that this issue was not preserved.

¶ 13 We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Relaford*, 2016 COA 99, ¶ 25; *see also People v. Pahl*, 169 P.3d 169, 182 (Colo. App. 2006) ("A trial court has broad discretion to determine the admissibility of expert testimony under CRE 702, and the exercise of that discretion will not be overturned on appeal absent an abuse of discretion."). An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law. *Relaford*, ¶ 25.

¶ 14 We review unpreserved claims for plain error. *See People v. Acosta*, 2014 COA 82, ¶ 77. Plain error is obvious and substantial. *Hagos v. People*, 2012 CO 63, ¶ 14. Reversal is required under this standard only if the error "so undermined the

6

fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Id.* (citation omitted).

### C.   Law and Analysis

¶ 15     "The admission of expert testimony about DNA evidence is governed by CRE 702 and 403." *People v. Marks*, 2015 COA 173, ¶ 24.  CRE 702 states, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  Evidence admitted under CRE 702 must be reliable and relevant.  *Marks*, ¶ 26 ("DNA evidence is ordinarily useful to the jury because it tends to make it more or less probable that the defendant is connected to the crime."); *see also* CRE 401 (Relevant evidence tends to make the existence of any fact of consequence "more probable or less probable than it would be without the evidence."); CRE 403 (Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice.").

¶ 16    The relevance of evidence indicating whether a defendant is the source of a certain DNA sample generally depends on whether the evidence is accompanied by a determination of its statistical significance.  *See Fishback v. People*, 851 P.2d 884, 893 n.18 (Colo. 1993) ("[A] declared [DNA] match, unaccompanied by its statistical significance, is essentially meaningless."), *abrogated on other grounds by People v. Shreck*, 22 P.3d 68 (Colo. 2001); *Marks,* ¶¶ 28-30 (noting that evidence that a defendant is a "possible match" to a given DNA sample is generally irrelevant and "meaningless" if unaccompanied by statistical data showing how likely it is that a defendant is the source of the DNA at issue) (citation omitted); *cf. People v. Rojas*, 181 P.3d 1216, 1222 (Colo. App. 2008) (concluding that a trial court properly allowed evidence that the victim could not be excluded as a possible match to DNA found on the defendant's penis where accompanying statistical data showed that 99.6% of the population could be excluded; the evidence was therefore relevant to whether the defendant had sexual contact with the victim).

¶ 17    Here, the expert testified that, to identify the source of a DNA profile, statistical analysis must show that the profile occurs in less

8

than one in three hundred billion people in the surrounding population. She then testified that Townsell was the source for the DNA profiles from the shoes, bandana, pantyhose, and mask. Concerning the left shoe's partial DNA profile, the expert stated that she identified Townsell as the source because the subject DNA profile "is more rare than 1 in 300 billion." The expert explained the match evidence's statistical significance and, thereby, the likelihood that Townsell is the source for the DNA profile found on items that the robber reportedly wore during the robbery. *See Marks*, ¶ 39 (Without an indication of statistical significance, "a jury does not know what to make of the fact that a person's DNA pattern is a possible match to the DNA evidence samples; 'the jury does not know whether the patterns are as common as pictures with two eyes, or as unique as the Mona Lisa.'") (citation omitted). Notably, except for the DNA from the mask, the DNA from the items came from a single male, and there was no evidence of DNA from any female — including E.R. — on the items.

¶ 18    The DNA evidence, the accompanying statistical analyses, and the circumstances surrounding the police's discovery of the items tended to make it more likely that Townsell was connected to the

9

robbery.  *See* CRE 401.  Accordingly, the trial court did not commit

error, plain or otherwise, in allowing the challenged evidence.  *See*

*Acosta*, ¶ 14; *Pahl*, 169 P.3d at 182.

III.    DNA Match Evidence: Alleged Discovery Violation

¶ 19    While Townsell concedes that the DNA match evidence

concerning the pantyhose was timely disclosed in an expert report

in January 2014, he asserts that the trial court erroneously allowed

evidence that his DNA matched DNA found on the shoes, bandana,

and mask because the prosecution untimely disclosed the expert

report containing this information in February 2014.  We discern no

such error.

A.    Preservation and Standard of Review

¶ 20    On March 13, 2014, while objecting to other evidence not

challenged on appeal, defense counsel mentioned the allegedly late

disclosure of the February 2014 expert report.  The trial court,

however, made no ruling concerning the February 2014 report.  The

next day, defense counsel repeated his objection to the February

2014 report and related DNA match evidence concerning the shoes,

bandana, and mask.  The trial court stated that it was "not able to

make a ruling" concerning the February 2014 report and the

challenged DNA match evidence, so it deferred ruling.  Following a recess, defense counsel failed to seek a ruling concerning the alleged discovery violation involving the February 2014 expert report, and defense counsel did not contemporaneously object to the challenged DNA match evidence when it was offered.  In spite of defense counsel's failure to obtain a final ruling on the matter, the trial court did not err in allowing the challenged DNA match evidence because this evidence was timely disclosed in the January 2014 expert report.

¶ 21    "In the event that a discovery violation is found, the decision whether to impose a sanction is within the sound discretion of the trial court." *People v. Lee*, 18 P.3d 192, 196 (Colo. 2001).  Such a ruling will not be disturbed absent an abuse of discretion.  *Id.*; *Relaford*, ¶ 25.  We defer to the trial court's findings of fact if they are supported by competent evidence in the record and review the trial court's legal conclusions de novo.  *People v. Blessett*, 155 P.3d 388, 393 (Colo. App. 2006); *see also Acosta*, ¶ 14.

B.    Law and Analysis

¶ 22    Crim. P. 16(I)(a)(1)(III) requires the prosecution to make available to the defense certain materials in its possession,

11

including "[expert] reports . . . made in connection with the
particular case, including results of . . . scientific tests,
experiments, or comparisons."  The prosecution must make such a
disclosure "as soon as practicable but not later than 35 days before
trial."  Crim. P. 16(I)(b)(3).  If, after complying with Crim. P. 16(I)'s
disclosure requirements, the prosecution "discovers additional
material or information which is subject to disclosure," it "shall
promptly notify" the defendant or his counsel.  Crim. P. 16(III)(b).

¶ 23    Here, the record supports the trial court's finding that the
timely disclosed January 2014 expert report demonstrated that
Townsell's DNA profile matched profiles from the pantyhose and
other items.  A portion of the January 2014 report (dated August
22, 2013) states that

- DNA profiles "indicative of the same unknown male donor"
  were developed from the pantyhose, bandana, and right
  shoe;

- the partial DNA profile developed from the left shoe "is
  indicative of the same unknown male donor from" the
  pantyhose, bandana, and right shoe; and

- the major contributor's DNA profile from the mask "is indicative of the same unknown male donor from" the shoes, pantyhose, and bandana.

A portion of the January 2014 expert report (dated August 26, 2013) states that

- the DNA profile from the pantyhose matched Townsell's DNA profile from the Convicted Offender Index (COI); and

- the DNA profile from the left shoe matched the DNA profile from the pantyhose and Townsell's COI DNA profile.

¶ 24    The January 2014 report states that (1) a single male's DNA profile matched the profile from the shoes, bandana, mask, and pantyhose; (2) only one person's DNA was found on the pantyhose; and (3) Townsell's COI DNA profile matched the profile from the pantyhose and left shoe. The record indicates that the prosecution timely, albeit convolutedly,[1] disclosed the expert's determination that Townsell's DNA profile matched DNA found on the pantyhose,

---

[1] The February 2014 expert report contained the results of a buccal (inner cheek) swab DNA test confirming that Townsell's DNA profile matched the profiles from the pantyhose and other items. The record indicates that the buccal swab was performed so the prosecution could present DNA match evidence without referring to Townsell's DNA profile's presence in the COI or his related prior convictions.

bandana, mask, and shoes.  *See* Crim. P. 16(I)(a)(1)(III), (b)(3).

Thus, finding no discovery violation from any untimely disclosure of

expert reports, the trial court did not err in allowing the challenged

evidence.  *See Relaford*, ¶ 25; *Blessett*, 155 P.3d at 393.

### IV.    Motion for a Mistrial

¶ 25    Townsell next contends that the trial court erred in failing to

declare a mistrial after E.R.'s mother referenced his prior

incarceration.  According to Townsell, a curative instruction could

not cure the harm from the challenged testimony, the prosecutor

intentionally elicited said testimony, and the evidence of Townsell's

guilt was not overwhelming.  We are not persuaded.

### A.    Additional Facts

¶ 26    At trial, defense counsel asked J.S., E.R.'s mother, whether

E.R. was married to Townsell.  J.S. replied, "If it's legal inside the

jail, yes."  The following exchange later occurred between J.S. and

defense counsel:

> Q[.:] So far as you knew at the time [of the
> robbery were] your daughter, [E.R.], and
> [Townsell] living together?
>
> A[.:] So far as I know, yes and no.
>
> Q[.:] Yes and no?

14

> A[.:] Yes and no.
>
> Q[.:] [W]as [Townsell] a good husband?
>
> A[.:] I take the [F]ifth. . . .
>
> Q[.:] [Y]ou said yes and no when I asked you if [Townsell] was living at [E.R.'s].  Why did you say that?
>
> A[.:] I stayed there a week, and he didn't stay there. . . .
>
> Q[.:] And isn't it true that you told the police . . . that [E.R.] and [Townsell] lived in an apartment in Aurora?
>
> A[.:] No, I did not.

¶ 27    The prosecutor later asked J.S. whether Townsell was the father of E.R.'s daughter.  J.S. said, "Yes.  Right after June of 2012 when we got back from Louisiana, my daughter told me they was pregnant, and they were together supposedly."  The following exchange later occurred:

> Q[.:] But you denied telling Detective Hansen that [Townsell] and [E.R.] lived together in an apartment in Aurora?
>
> A[.:] He asked me about [E.R.].  No, I asked him.  He wouldn't tell me anything. . . .  [N]o, I didn't tell him — well, I told him he was married.  So I guess he figured because of the first thing I asked is, "Where is her husband?"

15

> Q[.:] And when did [E.R.] and [Townsell] get
> married?
>
> A[.:] God only knows.  It was in 2000, and I'm
> trying to think — 2008 — -9.  She might have
> told me.  She took me out for Easter dinner,
> and as we were leaving the theater, she said,
> "Guess what mom?  I'm married."  That's all.
> That's how I learned about it.
>
> Q[.:] There wasn't a ceremony that you
> attended?
>
> A[.:] No.
>
> Q[.:] Were they — do you know whether there
> was a ceremony or married under common
> law?
>
> A[.:] I guess they got married in jail while he
> was still in jail.  Like I said, it was Easter
> Sunday.  The three girls took me out to lunch,
> and I was told when they were leaving the
> theater.

¶ 28    Later, defense counsel moved for a mistrial, arguing that, after

J.S.'s comments on direct examination about marriage and jail, "[i]t

was clear that the whole issue of the date of marriage was . . . a

ticking time bomb."  Defense counsel then stated,

> The date of the marriage was the least
> important thing that could have been asked on
> the cross-examination, and the prosecutor just
> kept on going over it until we got this witness
> to say that my client had been in jail.  And it
> clearly was eliciting that, and there is no way
> for me to stand up and object because the cat

16

> was out of the bag.  And I think it was
> purposefully elicited, so I'm asking for a
> mistrial.

The prosecutor responded that, "given the vagueness of their marriage," she assumed that E.R. and Townsell "were just common law married and only somewhat recently[.]"  According to the prosecutor, she was trying to elicit testimony that E.R. and Townsell were cohabiting at the time of the robbery, which was relevant and related to J.S.'s denial that she told the police that Townsell and E.R. lived together.  Defense counsel requested a limiting instruction if the trial court refused to grant a mistrial.

¶ 29    The trial court determined that "it did not appear [that the prosecutor was] intending to elicit that particular response as opposed to something that arguably would be relevant on marital relations, marital privilege, bias, motive."  Consequently, the trial court declined to declare a mistrial, but later issued the following curative instruction:

> I had advised you earlier . . . that there would
> [b]e instances where the Court would instruct
> you to disregard something that might be
> stated by a witness.  I do want to address that
> now.  [J.S.] identified the place of marriage
> between [T]ownsell and [E.R.]; namely, that
> was the jail.  I want you to put that entirely

17

out of your mind as if the testimony and the question had never been asked and the response never given.  And are you able to do that?  I'm looking now for your nods on this. So it's as if you had never heard that.  And I see nods from members of the jury.

### B.    Preservation and Standard of Review

¶ 30    We determine that this issue was properly preserved.  Further we reject the prosecution's argument that appellate review of this issue is barred by the doctrine of invited error.  *See People v. Foster*, 2013 COA 85, ¶ 25 ("The doctrine of invited error captures the principle that 'a party may not complain on appeal of an error that he has invited or injected into the case; he must abide by the consequences of his acts.'") (citation omitted).  J.S. stated, "If it's legal inside the jail, yes," in response to defense counsel's questioning whether Townsell and E.R. were married.  It was unclear at that point whether J.S. was referring to Townsell's incarceration for this case — where it was clear to the jury that Townsell was incarcerated during the entire trial — or for a previous case.  But, the record indicates that the prosecutor, not defense counsel, elicited the challenged facts — that E.R. married Townsell in jail while he was incarcerated in 2008 or 2009.  Accordingly,

defense counsel did not invite any error arising from the challenged testimony.

¶ 31     We review a trial court's decision to deny a mistrial for an abuse of discretion. *People v. Marko*, 2015 COA 139, ¶ 29 (*cert. granted on other grounds* Oct. 24, 2016). An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair, or contrary to law. *Relaford*, ¶ 25. "Under the abuse-of-discretion standard, an appellate court must affirm the trial court's decision if there is any evidence in the record to support the trial court's finding." *People v. Muckle*, 107 P.3d 380, 383 (Colo. 2005). Moreover, the "trial court is in a better position to evaluate any adverse effect of improper statements or testimony on a jury, [so] it has considerable discretion to determine whether a mistrial is warranted." *People v. Tillery*, 231 P.3d 36, 43 (Colo. App. 2009), *aff'd sub nom. People v. Simon*, 266 P.3d 1099 (Colo. 2011).

¶ 32     We review an erroneous reference to a defendant's prior criminality for nonconstitutional harmless error. *People v. Salas*, 2017 COA 63, ¶ 10.

19

### C.    Applicable Law

¶ 33    Because a mistrial is the most drastic of remedies, one is "only warranted where the prejudice to the accused is too substantial to be remedied by other means." *People v. Collins*, 730 P.2d 293, 303 (Colo. 1986).  Factors relevant to whether a mistrial is warranted include the nature of the inadmissible evidence, the weight of the admissible evidence of the defendant's guilt, and the value of a cautionary instruction.  *People v. Vigil*, 718 P.2d 496, 505 (Colo. 1986); *Tillery*, 231 P.3d at 43.

¶ 34    Generally, a curative instruction issued after a prejudicial statement is made remedies any harm caused by the statement. *People v. Mersman*, 148 P.3d 199, 203 (Colo. App. 2006).  A jury is presumed to have followed a curative instruction to disregard improper testimony.  *Tillery*, 231 P.3d at 43.  "Such an instruction is inadequate only when the improper testimony or statements are so prejudicial that, but for the exposure, the jury might not have found the defendant guilty."  *Id.*; *see also People v. Everett*, 250 P.3d 649, 663 (Colo. App. 2010).  Inadmissible evidence typically will have less prejudicial impact if it appears only in a fleeting reference. *See People v. Lahr*, 2013 COA 57, ¶ 24.

20

¶ 35   "[E]vidence of a defendant's criminal activity, which is unrelated to the offense charged, is inadmissible." *People v. Goldsberry*, 181 Colo. 406, 409, 509 P.2d 801, 803 (1973) (concluding that a curative instruction could not cure the prejudice from testimony of the defendant's prior criminality where the prosecutor intentionally elicited the information, evidence of guilt was "thin," and the proof of at least one of the charge's essential elements was entirely circumstantial).  But, an "ambiguous reference to evidence of a defendant's criminality does not necessitate a new trial." *Lahr*, ¶ 24; *see also Salas*, ¶ 18 (determining that "ambiguous" testimony of the defendant's prior criminality did not warrant a mistrial where the "remark was fleeting, minimally prejudicial, and immediately followed by a curative instruction," and the prosecution did not intentionally elicit the improper testimony); *People v. Ellis*, 30 P.3d 774, 777-78 (Colo. App. 2001) (concluding that court's instruction was sufficient to cure prejudice from a victim's testimony that the defendant had "shot a brother before").

D.    Analysis

¶ 36    We perceive no error in the trial court's refusal to declare a
mistrial.  The trial court's finding that the prosecutor did not
intentionally elicit the challenged testimony enjoys record support
— including (1) the prosecutor's explanation for inquiring about
E.R.'s and Townsell's marriage and living situation and (2) J.S.'s
testimony implying that E.R. and Townsell were not living together
at the time of the robbery — and we will not disturb it.  *See Muckle*,
107 P.3d at 383.  And, the challenged testimony was relatively
fleeting, constituting only a few lines in the transcript of the six-day
trial.  *See Salas*, ¶ 18; *Lahr*, ¶ 24.

¶ 37    Moreover, the challenged reference was ambiguous as to
Townsell's prior criminality.  J.S. only mentioned that Townsell was
in jail in 2008 or 2009, but she did not reference how long Townsell
was incarcerated, whether he was ever convicted in a prior criminal
proceeding, or the nature of any previous criminal charges.  As the
jury was instructed here, criminal defendants are presumed
innocent until proven guilty beyond a reasonable doubt; thus, the
jury could have inferred that Townsell may have been incarcerated
without ever being convicted of a crime.  *See Salas*, ¶ 18; *Tillery*,

22

231 P.3d at 43.  Further, we note the strength of the properly admitted evidence of Townsell's guilt — such as the DNA match evidence, the bank surveillance video of the robbery, evidence found in and near E.R.'s car, the GPS device's location, Townsell's and E.R.'s phone records, K.K.'s statements (whose admissibility we address below), and M.O.'s eyewitness testimony.  *See Salas*, ¶ 18; *Lahr*, ¶ 24.

¶ 38    In light of the foregoing — coupled with the trial court's prompt curative instruction, *see Mersman*, 148 P.3d at 203 — we will not disturb the trial court's determination that its instruction was sufficient to cure any prejudice from the challenged testimony. *Compare Goldsberry*, 181 Colo. at 409, 509 P.2d at 803 (reversing trial court's refusal to order mistrial where the prosecutor intentionally elicited the information, evidence of guilt was "thin," and the proof of at least one of the charge's essential elements was entirely circumstantial), *with Salas*, ¶ 18, *and Ellis*, 30 P.3d at 778. Accordingly, the trial court did not err in declining to declare a mistrial.  *See Relaford*, ¶ 25; *Marko*, ¶ 29.

## V.    Hearsay and Confrontation

¶ 39    Townsell argues that the trial court reversibly erred in allowing a police officer's testimony concerning K.K.'s statements to police because the challenged statements were (1) inadmissible hearsay and (2) testimonial hearsay admitted in violation of Townsell's confrontation rights, as he had no prior opportunity to cross-examine K.K.  We discern no reversible error.

### A.    Additional Facts

¶ 40    At a February 28, 2014, hearing, the prosecutor stated that K.K. would be unavailable to testify at trial, scheduled to begin in March 2014.

¶ 41    The second day of trial, a police officer testified about his interview of K.K. shortly after the robbery.  The officer described K.K. as "very upset," "petrified," and having trouble breathing and speaking.  Defense counsel objected, arguing that any more testimony about K.K.'s emotional "state" immediately following the robbery would be cumulative and unduly prejudicial.  The prosecutor responded that he was "laying a foundation for an excited utterance."  Defense counsel then argued that the officer's testimony concerning K.K.'s statements made during the police

24

interview at issue were not excited utterances because too much time had passed between the robbery and the interview.  The court overruled the objection.

¶ 42    The officer continued to testify about K.K.'s state following the robbery.  The prosecutor then asked the officer about K.K.'s statements to the officer describing the robbery.  Before the officer could answer, defense counsel objected on hearsay grounds.  The trial court overruled the objection, determining that the subject statements were "not too distant in time" and that a sufficient foundation had been laid to show that the statements were excited utterances.

¶ 43    The officer then testified that K.K. told him the following:

- The robber was a masked male wearing a long-sleeved shirt, jeans, and a dark hooded sweatshirt.

- The robber had a gun, which he pointed at K.K.'s face, scaring her.

- The robber jumped over the teller counter and said, "Give me the money, bitch."

- At some point, the robber pointed the gun at M.O.

- The gun was a small, silver semiautomatic pistol.

25

- The robber's mask looked homemade with eye holes and "maybe a mouth hole" cut out.

- The robber then opened K.K.'s teller drawer, removed money, checked the other teller drawers, and left the bank.

The prosecutor then asked, "Would it refresh your recollection to view your report whether [K.K.] described eye holes and a mouth hole or only eye holes?"  Without objection from defense counsel, the officer reviewed his report and the following exchange occurred:

> Q[.:] [D]oes that refresh your recollection as to what she described as a homemade looking mask?
>
> A[.:] Yes.
>
> Q[.:] What did she say about that?
>
> A[.:] Just that it had holes cut into it.

The officer next testified that he had asked K.K. to prepare a written statement.  After the officer reviewed K.K.'s statement — without objection from defense counsel — the following exchange occurred:

> Q[,:] [D]oes that refresh your recollection as to the description [K.K.] provided of the homemade-looking mask?
>
> A[.:] It does.
>
> Q[.:] And what did she indicate about the holes?

26

A[.:] Just eye holes were cut out.

The officer then stated that K.K. said that the robber wore gloves and she was unable to indicate the robber's skin color.

### B.    Preservation and Standard of Review

¶ 44    The parties agree that Townsell preserved his hearsay objection to K.K.'s oral statements to police.  But, we conclude, and he has conceded, that Townsell failed to preserve his hearsay objection to K.K.'s written statement.  *See People v. Bondsteel*, 2015 COA 165, ¶ 61 n.6 ("An appellant's failure to respond in the reply brief to an argument made in the answer brief may be taken as a concession.") (*cert. granted* Oct. 31, 2016).  The parties also agree that Townsell failed to preserve his argument that admitting the challenged evidence violated his confrontation rights.

¶ 45    We review a trial court's evidentiary rulings for an abuse of discretion.  *Relaford*, ¶ 25.  An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law.  *Id.*  Concerning a defendant's right to confrontation, whether a statement is testimonial is a question of law subject to de novo review.  *People v. Warrick*, 284 P.3d 139, 144 (Colo. App. 2011).

27

¶ 46    Where Townsell's arguments are preserved, we review for

harmless error.  *See Yusem v. People*, 210 P.3d 458, 469 (Colo.

2009).  Under this standard, any erroneous admission requires

reversal unless the error was harmless, that is, unless there is no

"reasonable probability that it contributed to a defendant's

conviction by substantially influencing the verdict or impairing the

fairness of the trial."  *People v. Casias*, 2012 COA 117, ¶ 61.

¶ 47    Where Townsell's arguments are not preserved, we review for

plain error.  *See Acosta*, ¶ 77.  Plain error is obvious and

substantial.  *Hagos*, ¶ 14.  Reversal is required under this standard

only if the error "so undermined the fundamental fairness of the

trial itself so as to cast serious doubt on the reliability of the

judgment of conviction."  *Id.* (citation omitted).

### C.    Law

¶ 48    Hearsay is "a statement other than one made by the declarant

while testifying at the trial or hearing, offered in evidence to prove

the truth of the matter asserted."  CRE 801(c).  If an out-of-court

statement is not offered for its truth, it is admissible as nonhearsay

evidence if it is relevant.  *See* CRE 402; *see also People v. Welsh*,

176 P.3d 781, 790 (Colo. App. 2007).  If a statement is hearsay, it is

28

inadmissible unless it (1) falls within an exception to the hearsay rule and (2) does not offend a defendant's constitutional right to confrontation.  CRE 802; *Nicholls v. People*, 2017 CO 71, ¶ 16.

¶ 49      The hearsay exception relevant here, found in CRE 803(2), states that the hearsay prohibition does not exclude excited utterances.  Excited utterances are "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  CRE 803(2).  Admission under CRE 803(2) requires that "(1) the occurrence or event was sufficiently startling to render inoperative the normal reflective thought processes of an observer; (2) the declarant's statement was a spontaneous reaction to the event; and (3) direct or circumstantial evidence supports an inference that the declarant had the opportunity to observe the startling event."  *People v. Hagos*, 250 P.3d 596, 622 (Colo. App. 2009); *see also People v. Martinez*, 83 P.3d 1174, 1177 (Colo. App. 2003) (noting that the "trial court is in the best position to consider the effect of the startling event on the declarant" and has "wide discretion" in determining admissibility under CRE 803(2)).

¶ 50    A defendant has the right to confront and cross-examine witnesses.  U.S. Const. amend. VI; Colo. Const. art. II, § 16.  The right to confrontation "is principally concerned with 'testimonial' statements, i.e., statements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  *Nicholls*, ¶ 22; *see also Crawford v. Washington*, 541 U.S. 36, 52 (2004).  Therefore, the Confrontation Clauses bar "admission of testimonial hearsay of a witness unless the declarant is unavailable at trial and the defendant had a prior opportunity to cross-examine [her]."  *Nicholls*, ¶ 22; *People v. Fry*, 92 P.3d 970, 981 (Colo. 2004).  Nontestimonial statements do not implicate a defendant's right to confrontation.  *Davis v. Washington*, 547 U.S. 813, 822 (2006); *Nicholls*, ¶ 30.

¶ 51    "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."  *Davis*, 547 U.S. at 831-32 (noting that initial police inquiries involving situations like domestic disputes — in which the inquiries allow police to "assess the situation, the threat to their own safety, and possible danger to

the potential victim" — "*often*" produce nontestimonial statements). Statements may be nontestimonial where their primary purpose is to "catch a dangerous [suspect]" who "is still at large[.]"  *Williams v. Illinois*, 567 U.S. 50, 84 (2012).

### D.    Analysis

¶ 52    We first determine that the trial court did not abuse its discretion in allowing K.K.'s initial statements (via the officer's testimony) as excited utterances.  *See* CRE 803(2); *Relaford*, ¶ 25. The record indicates K.K. made the statements at issue while visibly upset and shortly after she was robbed at gunpoint, and it is undisputed that K.K. had an opportunity to observe the robbery. Accordingly, we agree with the trial court that those statements are excited utterances and, therefore, not barred by the hearsay rule. *See Hagos*, 250 P.3d at 622; *Martinez*, 83 P.3d at 1177.

¶ 53    Next, we address K.K.'s three statements given by the officer after he reviewed K.K.'s written statement without objection: (1) the robber's mask had only eye holes cut out; (2) the robber wore gloves; and (3) K.K. was unable to identify the robber's skin color. The first and second statements were cumulative of other properly admitted evidence — namely, corroborating eyewitness accounts,

the bank's surveillance video of the robbery, and the gloves and mask found in or near E.R.'s car.  And, the third statement — that K.K. was unable to identify the robber's skin color — did not substantially aid or hinder either party.  *See People v. Joyce*, 68 P.3d 521, 524 (Colo. App. 2002) (concluding that the trial court did not plainly err in allowing hearsay statements where the statements were cumulative of other properly admitted evidence and had "little impact on the verdict").  Given this analysis and the strong evidence of Townsell's guilt noted above, we conclude that any error in allowing the challenged evidence was not plain because it did not "so undermin[e] the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 14 (citation omitted).

¶ 54    Turning to Townsell's confrontation claim, the record indicates that K.K. made the challenged statements to police shortly after the robbery while police were actively pursuing, but had not yet identified or detained, a robber reportedly armed with a semiautomatic pistol.  K.K.'s description of the robber and his actions, therefore, assisted the police in identifying the robber, assessing the danger the robber at large posed to the public, and

detaining the fleeing robber.  *See Davis*, 547 U.S. at 831; *see also Williams*, 567 U.S. at 83 ("[A] person who makes a statement to resolve an ongoing emergency is not acting like a trial witness because the declarant's purpose is not to provide a solemn declaration for use at trial, but to bring an end to an ongoing threat.").  The testimonial nature of the challenged statements here is objectively doubtful and, given the lack of a contemporaneous objection, we cannot say that any error in allowing the statements was sufficiently obvious to constitute plain error.  *See Hagos*, ¶ 14.

## VI.    Insufficient Evidence: Felony Menacing and Aggravated Robbery Concerning M.O.

¶ 55    Townsell contends that there is insufficient evidence to support his menacing conviction concerning M.O. because there is no evidence that Townsell knew of M.O.'s presence in the bank. Townsell also asserts that there is insufficient evidence to support his aggravated robbery conviction concerning M.O. because there is no evidence that (1) Townsell knew of M.O.'s presence or (2) M.O. had any right to control the money in K.K.'s teller drawer.  We are not persuaded.

## A.    Preservation and Standard of Review

¶ 56    We may consider a sufficiency of the evidence claim regardless of whether it is raised for the first time on appeal.  *See People v. Duncan,* 109 P.3d 1044, 1045 (Colo. App. 2004); *see also People v. McCoy,* 2015 COA 76M, ¶ 6 (*cert. granted in part* Oct. 3, 2016).[2] We review the record de novo to determine whether the evidence at trial was sufficient "both in quantity and quality to sustain the defendant's conviction."  *Clark v. People,* 232 P.3d 1287, 1291 (Colo. 2010).

## B.    Applicable Law

¶ 57    We are guided by the following principles when reviewing the sufficiency of the evidence:

- The Due Process Clauses of the United States and Colorado Constitutions require proof of guilt beyond a reasonable doubt on each essential element of a crime.  *People v. Noland,* 739 P.2d 906 (Colo. App. 1987).  Accordingly, we

---

[2] Divisions of this court are divided as to whether to apply plain error analysis in certain cases to claims of error alleging insufficiency of the evidence.  *Compare People v. Lacallo,* 2014 COA 78, ¶¶ 2, 5-27 (applying plain error analysis), *with People v. McCoy,* 2015 COA 76M, ¶ 6 (rejecting plain error analysis) (*cert. granted in part* Oct. 3, 2016).

34

must determine "whether the evidence, both direct and circumstantial, when viewed as a whole and in a light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable fact finder that the defendant is guilty of the crime charged beyond a reasonable doubt." *Duncan,* 109 P.3d at 1045.

- We afford the same status to direct and circumstantial evidence. *People v. Bennett,* 183 Colo. 125, 131, 515 P.2d 466, 469 (1973).

- We give the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence. *People v. Vecellio,* 2012 COA 40, ¶ 12. "It does not matter that, were we the trier of fact, we might have reached a different conclusion." *Clark,* 232 P.3d at 1291.

- "[V]erdicts in criminal cases may not be based on guessing, speculation, or conjecture." *People v. Stark,* 691 P.2d 334, 339 (Colo. 1984).

¶ 58 A person commits the crime of menacing if, "by any threat or physical action, he . . . knowingly places or attempts to place another person in fear of imminent serious bodily injury . . . [b]y the

use of a deadly weapon . . . ." § 18-3-206(1)(a), C.R.S. 2017.  A

person acts knowingly with respect to an element of an offense

when the person is aware that his conduct is of such a nature or

that such circumstances exist, or when he is aware that his

conduct is practically certain to cause the result.  *People*

*v. Heywood*, 2014 COA 99, ¶ 18; *People v. Johnson*, 923 P.2d 342,

346 (Colo. App. 1996).

¶ 59    "A person who knowingly takes anything of value from the

person or presence of another by the use of force, threats, or

intimidation commits robbery." § 18-4-301(1), C.R.S. 2017.  A

person commits aggravated robbery if, "during the act of robbery or

immediate flight therefrom," he, "by the use of force, threats, or

intimidation with a deadly weapon[,] knowingly puts the person

robbed or any other person in reasonable fear of death or bodily

injury." § 18-4-302(1)(b), C.R.S. 2017.

¶ 60    "Property is taken from the 'presence of another' . . . 'when it is

so within the victim's reach, inspection or observation that he . . .

would be able to retain control over the property but for the force,

threats, or intimidation directed by the perpetrator against the

victim.'" *People v. Williams*, 2012 COA 165, ¶ 38 (citation omitted);

36

*see also People v. Bartowsheski*, 661 P.2d 235, 244 (Colo. 1983)

("[T]he 'presence' element is broad enough to encompass the

situation where the victim of the robbery, against whom the . . .

threats . . . [are] directed, is present in one room of a family home

and the taking occurs within another room.").

## C.    Analysis

¶ 61    Giving the prosecution the benefit of every reasonable

inference that might fairly be drawn from the evidence, we conclude

that there is sufficient evidence in the record to allow reasonable

jurors to find that Townsell knew of M.O.'s presence in the bank

lobby.  The following evidence was admitted at trial:

- The robber entered the bank through large glass doors.

- The robber's mask had eye holes cut out.

- M.O. heard the robber yell "nobody fucking move," which

    M.O. understood as being directed at himself and K.K.

    M.O. obeyed and remained seated until the robber left.

- The robber twice ran past M.O., who was wearing a bright

    yellow shirt and seated in a three-sided cubicle with the

    opening facing the teller counter.  M.O.'s cubicle walls were

    partially opaque and partially glass.  M.O. was about ten

> feet from the door where the robber entered and exited the
> bank.
>
> - K.K. saw the robber point the gun at M.O.  M.O. testified
>   that the robber pointed the gun "in [his] direction."
> - The bank lobby was small enough for the robber to run
>   from one end to the other, take money from K.K.'s teller
>   drawer, and return to the door on the other side of the
>   lobby in twenty-eight seconds.

The record thus contains substantial evidence from which a reasonable jury could infer that Townsell knew that M.O. was present and pointed a gun at him during the robbery, thereby "knowingly plac[ing] or attempt[ing] to place [M.O.] in fear of imminent serious bodily injury . . . [b]y the use of a deadly weapon[.]"  § 18-3-206(1)(a).  A reasonable jury could also infer from the evidence that Townsell had the requisite mental state to "knowingly" rob M.O.  *See* § 18-4-301(1); *see also Heywood*, ¶ 18; *Johnson*, 923 P.2d at 346.

¶ 62    We also conclude that the evidence was sufficient to allow reasonable jurors to find that Townsell took something of value "from the person or presence of" M.O. because M.O. could have

"retain[ed] control over the property but for the force, threats, or
intimidation directed by" Townsell against M.O.  *Williams*, ¶ 38.
The following evidence was admitted at trial:

- M.O. worked at the bank as a financial services consultant.

- Only three other bank employees were in the bank during
  the robbery — K.K. was in the lobby, and another bank
  teller and an administrative assistant were in another room.

- M.O. possessed the keys to the bank, which he used to lock
  the doors after the robber left.

- Immediately after the robber left the bank, M.O. proceeded
  to follow protocols, including locking the bank and calling
  the police.

¶ 63    A reasonable jury could thus infer that M.O. had some
supervisory duties as a bank employee and, consequently, had the
right to protect bank property (including the money in K.K.'s
drawer) from being taken illicitly.  *Compare Williams*, ¶ 44 (judging
the evidence sufficient to support a robbery conviction where the
victim, a co-owner of a tattoo shop where the robbery occurred, had
sufficient ownership or control over the money in another
co-owner's pockets), *and Anderson-Bey v. Zavaras,* 641 F.3d 445,

39

452 (10th Cir. 2011) (noting that, under Colorado law, evidence was sufficient to support a robbery conviction where the victim was an employee with "general responsibilities with respect to property in the store" — including closing and securing the shop "at the end of the day" — although the victim had no specific duties concerning the cash register that was robbed), *with People v. Ridenour*, 878 P.2d 23, 27 (Colo. App. 1994) (concluding that the evidence was not sufficient to support a robbery conviction where the alleged victim was a ticket taker at a movie theater and had no (1) physical possession of the stolen money; (2) duties to handle payments or cash; or (3) right to control money stolen from the theater's safe).

¶ 64    The evidence in the record, when viewed in the light most favorable to the prosecution, was sufficient to support the menacing and aggravated robbery convictions concerning M.O.  *See Duncan,* 109 P.3d at 1045.

## VII.   Cumulative Error

¶ 65    Townsell argues that the asserted errors, when analyzed in the aggregate, require reversal because they undermined the fundamental fairness of the proceedings.  We have identified no errors, let alone any errors warranting reversal.  Thus, we conclude

that no errors cumulatively operated to deprive Townsell of a fair trial. *See People v. Carter*, 2015 COA 24M-2, ¶ 80 ("[T]he doctrine of cumulative error requires that numerous errors be committed, not merely alleged [and] a conviction will not be reversed if the cumulative effect of any errors did not substantially prejudice the defendant's right to a fair trial.") (citations omitted).

### VIII.  Consecutive Sentences For Aggravated Robbery

¶ 66    Lastly, Townsell asserts that the trial court erroneously entered consecutive sentences for the aggravated robbery convictions because the convictions are based on identical evidence and the trial court mistakenly believed that consecutive sentences were mandatory.  We disagree.

### A.    Preservation and Standard of Review

¶ 67    The parties agree that this issue was properly preserved.

¶ 68    We review a trial court's sentencing decision for an abuse of discretion. *People v. Espinoza*, 2017 COA 122, ¶ 21.  An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law. *Relaford*, ¶ 25. We review a trial court's application of sentencing statutes de novo. *Espinoza*, ¶ 21.

¶ 69    In construing legislation, we look first to the plain language of

the statute, reading it as a whole.  *Young v. Brighton Sch. Dist. 27J*,

2014 CO 32, ¶ 11.  Then, if the language is ambiguous, or if the

statute appears to conflict with other provisions, we "construe the

statute in light of the General Assembly's objective," presuming

"that the legislature intended" the statutory scheme to have "a

consistent, harmonious, and sensible effect."  *Anderson v. Vail

Corp.*, 251 P.3d 1125, 1127-28 (Colo. App. 2010); *see also

Espinoza*, ¶ 23.  "If the conflict is irreconcilable, however, a 'special

or local provision prevails as an exception to [a] general provision,

unless the general provision is the later adoption and the manifest

intent is that the general provision prevail.'"  *Espinoza*, ¶ 24

(citation omitted).

¶ 70    "When a court 'imposes consecutive sentences under the

mistaken belief that it has no discretion to impose concurrent

sentences,' '[a] remand for resentencing is appropriate.'"  *Id.* at ¶ 25

(quoting *People v. O'Connell*, 134 P.3d 460, 466 (Colo. App. 2005)).

### B.    Law and Analysis

¶ 71    The robbery at issue occurred on June 15, 2013.  *See People

v. Wolfe*, 213 P.3d 1035, 1036 (Colo. App. 2009) ("[T]he statutory

authority to impose a sentence is determined by the sentencing

scheme in effect on the date of the offense.").  The operative version

of section 18-1.3-406(1)(a), C.R.S. 2012, states, "A person convicted

of two or more separate crimes of violence arising out of the same

incident *shall* be sentenced for such crimes so that sentences are

served consecutively rather than concurrently."  (Emphasis added.)

The statute also specifies that subsection 406(1)(a) "applies to . . .

[a]ggravated robbery[.]"  § 18-1.3-406(2)(a)(II)(F).

¶ 72    A related sentencing statute provides

> If more than one guilty verdict is returned as
> to any defendant in a prosecution where
> multiple counts are tried . . ., the sentences
> imposed shall run concurrently; except that,
> where multiple victims are involved, the court
> may, within its discretion, impose consecutive
> sentences.

§ 18-1-408(3), C.R.S. 2017.  Section 18-1-408(3) "mandates

imposition of concurrent sentences for offenses committed against a

*single victim* when the counts are based on the same act or series of

acts arising from the same criminal episode and the evidence

supporting the counts is identical."  *People v. Jurado*, 30 P.3d 769,

772-73 (Colo. App. 2001) (emphasis added); *see also Schneider

v. People*, 2016 CO 70, ¶ 12 (noting that concurrent sentences are

mandatory under section 18-1-408(3) only for separate offenses —
"based on the same act or series of acts arising from the same
criminal episode" — that are supported by identical evidence "and
do not involve multiple victims") (citation omitted).

¶ 73    As relevant here, section 18-1-408(3) mandates concurrent
sentences when only one victim is involved.  The record shows that
the bank robbery involved at least two victims — K.K. and M.O.
Accordingly, section 18-1-408(3)'s concurrent sentence requirement
is inapplicable here.  *See Schneider*, ¶ 12; *Jurado*, 30 P.3d at
772-73.

¶ 74    Regardless, to the extent that the two statutes seem to
conflict, section 18-1.3-406(1)(a)'s pertinent provisions — which are
more specific to the crime of aggravated robbery and other crimes of
violence — prevail over section 18-1-408(3)'s more general terms.
*See Espinoza*, ¶ 24.  The plain language of sections 18-1.3-406(1)(a)
and -406(2)(a)(II)(F), C.R.S. 2012, indicates that consecutive
sentences are mandatory in cases such as this, where a person has
been "convicted of two or more separate crimes of violence arising
out of the same incident."  Accordingly, we conclude that the trial
court did not err in interpreting the applicable sentencing statutes

44

or in imposing consecutive sentences for Townsell's aggravated robbery convictions.  *See Espinoza*, ¶ 21.

### IX.   Conclusion

¶ 75    The judgment and sentences are affirmed.

JUDGE FURMAN and JUDGE ASHBY concur.

# Court of Appeals

**STATE OF COLORADO**
**2 East 14th Avenue**
**Denver, CO 80203**
**(720) 625-5150**

**PAULINE BROCK**
**CLERK OF THE COURT**

## NOTICE CONCERNING ISSUANCE OF THE MANDATE

Pursuant to C.A.R. 41(b), the mandate of the Court of Appeals may issue forty-three days after entry of the judgment.  In worker's compensation and unemployment insurance cases, the mandate of the Court of Appeals may issue thirty-one days after entry of the judgment.  Pursuant to C.A.R. 3.4(m), the mandate of the Court of Appeals may issue twenty-nine days after the entry of the judgment in appeals from proceedings in dependency or neglect.

Filing of a Petition for Rehearing, within the time permitted by C.A.R. 40, will stay the mandate until the court has ruled on the petition.  Filing a Petition for Writ of Certiorari with the Supreme Court, within the time permitted by C.A.R. 52(b), will also stay the mandate until the Supreme Court has ruled on the Petition.

BY THE COURT:            Alan M. Loeb
                         Chief Judge

DATED:  October 19, 2017

*Notice to self-represented parties*:  *The Colorado Bar Association provides free volunteer attorneys in a small number of appellate cases.  If you are representing yourself and meet the CBA low income qualifications, you may apply to the CBA to see if your case may be chosen for a free lawyer.  Self-represented parties who are interested should visit the Appellate Pro Bono Program page at* http://www.cba.cobar.org/repository/Access%20to%20Justice/AppelatePr oBono/CBAAppProBonoProg_PublicInfoApp.pdf