| | |
|---|---|
| Supreme Court, State of Colorado<br>2 East 14th Ave., Denver, CO 80203<br><br>Petition for Writ of Certiorari; Arapahoe County District Court; Honorable Kurt A. Horton; Case Number 13CR2039 | DATE FILED<br>June 7, 2018 10:24 PM<br>FILING ID: A6FEDA1760ED1<br>CASE NUMBER: 2018SC415 |
| Petitioner<br>JAMALE D. TOWNSELL,<br><br>v.<br><br>Respondent<br>THE PEOPLE OF THE STATE OF COLORADO. | |
| Attorney for Petitioner<br>Krista A. Schelhaas (Alternate Defense Counsel)<br>Schelhaas Law LLC<br>PO Box 621355<br>Littleton, CO 80162<br>(303) 803-4750<br>kschelhaas@comcast.net<br>Attorney Reg. No. 36616 | Case No. |
| PETITION FOR WRIT OF CERTIORARI | |

## CERTIFICATE OF COMPLIANCE

I hereby certify that this petition complies with all requirements of C.A.R. 32 and C.A.R. 53, including all formatting requirements set forth in these rules. Specifically, the undersigned certifies that:

The petition complies with the applicable word limits set forth in C.A.R. 53(a).

It contains 3,675 words.

I acknowledge that this petition may be stricken if it fails to comply with any of the requirements of C.A.R. 32 and C.A. R. 53.

<u>s/ Krista A. Schelhaas</u>
Krista A. Schelhaas

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................v

ADVISORY LISTING OF THE ISSUE ...................................................1

BASIS OF JURISDICTION ...................................................................1

STATEMENT OF THE CASE...............................................................2

ARGUMENTS.....................................................................................4

    I.      The Division's Decision That the District Court Lacked Discretion to Impose Concurrent Sentences is Not in Accord With *Marquez v. People*, 2013 CO 58, 311 P.3d 265; Conflicts With *People v. Espinoza*, 2017 COA 122 (*cert. granted* May 29, 2018); and is Not Supported by Any Published Colorado Case ........................................4

        A.    A Sentencing Court Has Discretion to Impose Concurrent Sentences for Convictions Supported by Identical Evidence and Involving Multiple Victims........................................................4

        B.    The District Court Erroneously Believed That It Did Not Have Discretion to Impose Concurrent Sentences..............................8

    II.    The Division Decided Contrary to This Court's Decision in *People v. Goldsberry*, 181 Colo. 406, 409, 509 P.2d 801, 803 (1973), that the Prosecutor's Elicitation of Mr. Townsell's Prior Incarceration Was Harmless ........................................................................................10

        A.    The Prosecutor Elicited Testimony That Mr. Townsell Was Previously Incarcerated................................................................10

        B.    Longstanding Colorado Case Law Establishes that References to Prior Criminality Elicited by the People Cannot be Cured by an Instruction..........................................................................11

C.     Because the Physical Description of the Robbery Suspect Substantially Differed From Mr. Townsell, the Prior Jail Reference Created Reversible Error and Could Not be Cured by an Instruction.............................................................................13

III.    The Court of Appeals Conclusion That the Evidence Was Sufficient to Sustain the Aggravated Robbery Conviction as to M.O. is Not in Accord With *People v. Borghesi*, 66 P.3d 93 (Colo. 2003); or *People v. Bartowsheski*, 661 P.2d 235, 244 (Colo. 1983); and Contradicts *People v. Ridenour*, 878 P.2d 23 (Colo. App. 1994) ...........................14

A.     A Robbery Conviction Requires Physical Force Directed at a Victim Who Has Close Proximity to the Stolen Items and a Right to Control the Stolen Items ...............................................15

B.     No Evidence Established That Force Was Directed at M.O. or That M.O. Had Any Right to Control the Stolen Money .........16

CONCLUSION.....................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Edmisten v. People*, 176 Colo. 262, 490 P.2d 58 (1971) .........................................11

*Juhl v. People*, 172 P.3d 896 (Colo. 2007) ........................................................... 7-8

*Marquez v. People*, 2013 CO 58, 311 P.3d 265 ................................................ 4-5, 7

*People v. Bartowsheski*, 661 P.2d 235 (Colo. 1983) ...............................................15

*People v. Benton*, 829 P.2d 451 (Colo. App. 1991)..................................................15

*People v. Borghesi*, 66 P.3d 93 (Colo. 2003) ...........................................................15

*People v. Elmarr*, 2015 CO 53, 351 P.3d 431 .........................................................11

*People v. Espinoza*, 2017 COA 122 ...................................................................... 4-8

*People v. Garrison*, 2017 COA 107 ..........................................................................8

*People v. Goldsberry*, 181 Colo. 406, 509 P.2d 801 (1973).......................10, 12, 14

*People v. Hahn*, 813 P.2d 782 (Colo. App. 1991) .....................................................7

*People v. Jurado*, 30 P.3d 769, 773 (Colo. App. 2001).............................................7

*People v. O'Shaughnessy*, 275 P.3d 687 (Colo. App. 2010), *aff'd on other grounds*, 2012 CO 9, 269 P.3d 1233...............................................................................................7

*People v. Ridenour*, 878 P.2d 23 (Colo. App. 1994) ......................................... 15-17

*Qwest Servs. Corp. v. Blood*, 252 P.3d 1071 (Colo. 2011) ....................................11

# TABLE OF AUTHORITIES

**Statutes**

§ 18-1-408, C.R.S. ............................................................................................... 5-8

§ 18-1.3-406, C.R.S ............................................................................................. 4-8

## ADVISORY LISTING OF THE ISSUES

I.  Whether the Court of Appeals erred in concluding that the district court lacked discretion to impose concurrent sentences for two aggravated robbery convictions that were based on identical evidence and named two victims.

II.  Whether the Court of Appeals erred in concluding that a jury instruction was sufficient to cure the harm resulting from the prosecutor's elicitation of evidence that Mr. Townsell was previously incarcerated and the evidence of guilt was thin.

III.  Whether the Court of Appeals erred in concluding that the evidence was sufficient to sustain an aggravated robbery conviction when no force was directed at the named victim and the record did not establish that the named victim had any right to control the stolen money.

## BASIS OF JURISDICTION

The Court of Appeals issued its unpublished opinion on April 5, 2018.  *See People v. Townsell*, 14CA1225, Apr. 5, 2018 (not published pursuant to C.A.R. 35(f)).  [Attachment A].  Mr. Townsell filed a petition for rehearing on April 19, 2018.  The petition for rehearing was denied on May 10, 2018.  [Attachment B]. This petition is filed within twenty-eight days of the denial of the petition for rehearing, as required by C.A.R. 52(b)(3).

This Court has jurisdiction under Colorado Constitution article VI, section 2, and under section 13-4-108(2), C.R.S.  This Court should review the opinion of the Court of Appeals on a writ of certiorari because (1) a division of the Court of Appeals has decided a question of substance in a way probably not in accord with applicable decisions of the Supreme Court, and (2) a division of the Court of Appeals has rendered a decision in conflict with the decision of another division of the Court of Appeals.  C.A.R. 49(a)(2)&(3).

## STATEMENT OF THE CASE

Jamale Townsell stands 6'2" tall and is six inches taller than the man who robbed the Bank of the West on June 15, 2013.  (TR 3/17/14, p 42:12-16).  Every witness testified that the robber was between 5'7" and 5'9".  (TR 3/12/14, p 56:11-13; p 86:1-2; p 102:18-19; p 175:12-15; p 176:17-20; p 177: 12-16).  Video surveillance corroborates that witness testimony.  (EX 1).  Both the senior corporate security officer and the detective who viewed the videotaped surveillance and used stationary items in the bank to determine height and distances, concluded that the robber was 5'7" or 5'8" tall.  (TR 3/12/14, p 86:1-2; p 176:11-20).

The vast height discrepancy is not the only dubious evidence.  The record establishes that Mr. Townsell is right handed.  (TR 3/17/14, p 65:11-14).  But the

robber displayed such left hand dominance that he ran into the bank with the gun in his left hand, switched hands so that he could utilize his left hand for opening the teller drawer, removing the money, and placing the money into his bag, and then returned the gun to his left hand as he exited the bank.  (EX 1; TR 3/12/14, p 84:11-13; p 110:15-20; TR 3/17/14, p 65:11-14).

Evidence of an alternate suspect was introduced at trial.  The alternate suspect was Mr. Townsell's estranged wife's brother – a man who, at 5'8", matched the robber's physical description and lived close to the home of the getaway car owner.  (TR 3/17/14, p 42:7-11; p 216:19 – p 217:16; EX D).  Significantly, the stolen money was recovered from the estranged wife shortly after the robbery with the aid of a GPS tracker, in a neighborhood near her sister's home.  (TR 3/17/14, p 223:11 – p 224:16).

The prosecution relied on DNA evidence to convict Mr. Townsell.  The DNA was found on items near the recovered money.  The DNA's location had an innocuous explanation because it was found in the trunk of the car that Mr. Townsell shared with his estranged wife.  Although the couple's relationship was ending, they shared a child and continued communication.  The child was in the car when the wife was arrested.  (TR 3/12/14, p 238:9-16).

Mr. Townsell was convicted of aggravated robbery of the bank teller, K.K.,

aggravated robbery of another bank employee, M.O., two counts of menacing, and

theft.  His aggravated robbery sentences were imposed consecutively, resulting in a

32-year prison sentence.

## ARGUMENTS

**I. The Division's Decision That the District Court Lacked Discretion to Impose Concurrent Sentences is Not in Accord With *Marquez v. People*, 2013 CO 58, 311 P.3d 265; Conflicts With *People v. Espinoza*, 2017 COA 122 (*cert. granted* May 29, 2018); and is Not Supported by Any Published Colorado Case**

A.  A Sentencing Court Has Discretion to Impose Concurrent Sentences
for Convictions Supported by Identical Evidence and Involving Multiple Victims

A "single volitional act" involving multiple victims is supported by identical

evidence and does not require consecutive sentencing.  *People v. Espinoza*, 2017

COA 122, ¶ 40 (*cert. granted* May 29, 2018).  In *Espinoza*, the defendant's "ten

attempted murder convictions were supported by identical evidence, despite

naming different victims, because the same evidence formed the basis of each

conviction."  *Id.* at ¶ 26.  Therefore the division held that "separately named

victims do not create separate crimes of violence under section 18-1.3-406(1)(a)[,

C.R.S.] when identical evidence supports each conviction, and in such

circumstances, a court retains discretion to impose concurrent sentences under

section 18-1-408(3)[, C.R.S.]." *Id.*

Thus, under section 18-1-408(3), multiple counts can be supported by

identical evidence while involving multiple victims.  This is because the statute

mandates concurrent sentencing for counts based on identical evidence but

provides an exception for multiple victims.  If incidents involving multiple victims

could never be supported by identical evidence, the exception would be

unnecessary.  *See Espinoza*, ¶ 41(to give effect to the plain language of both

statutes, some evidence beyond the existence of multiple victims must exist to

establish a 'separate crime'").

This Court has

> made clear that a criminal episode for purposes of  . . . mandatory
> concurrent sentencing when the separate offenses arising from such an
> episode are actually proved by identical evidence, contemplates . . .
> only those offenses, arising either from the same conduct or connected
> in such a manner that their prosecution will involve substantially
> interrelated proof.

*Marquez v. People*, 2013 CO 58, ¶ 17, 311 P.3d 265, 271.  Crimes that involve

"interrelated proof" are those "that occur in the same or closely related place, and

acts that form part of a schematic whole." *Id.* at ¶ 17, 311 P.3d at 271-72.

The convictions here arose from the same conduct and involved interrelated

proof.  During sentencing, the district court explained that the facts involved one sixty-second episode.  (TR 5/12/14, p 49:15-21).  The robber entered the bank, sprinted through the lobby, hurdled the counter, and demanded and left with money from K.K.'s drawer.  The prosecution used this one set of actions to support the convictions involving both M.O. and K.K.  There were no additional or different actions used to support the conviction involving M.O.  Nor were there additional or different actions used to support the conviction involving K.K.

The *Townsell* Division here did not address the *Espinoza* holding.  Instead, the *Townsell* Division relied on *Espinoza*, ¶ 24, for the proposition that, "to the extent that the two statutes seem to conflict, section 18-1.3-406(1)(a)'s pertinent provisions — which are more specific to the crime of aggravated robbery and other crimes of violence — prevail over section 18-1-408(3)'s more general terms." *Townsell*, ¶ 74.  However, *Espinoza* specifically held that "sections 18-1-408(3) and 18-1.3-406(1)(a) do not conflict, but instead provide for different sentencing requirements in two non-overlapping sets of circumstances." *Espinoza*, ¶ 32.  In agreeing with "[s]everal divisions" of the court of appeals, the *Espinoza* Division concluded that:

> For multiple violent crimes arising from the same criminal episode, section 18-1-408(3) requires concurrent sentencing for counts based on the "same act or series of acts" and supported

> by "identical evidence," § 18-1-408(2), (3), but in cases of multiple victims authorizes the court to impose consecutive sentences in its discretion.

*Espinoza*, ¶ 32; *see People v. O'Shaughnessy*, 275 P.3d 687, 697 (Colo. App. 2010), *aff'd on other grounds*, 2012 CO 9, 269 P.3d 1233; *People v. Jurado*, 30 P.3d 769, 773 (Colo. App. 2001); *People v. Hahn*, 813 P.2d 782, 784 (Colo. App. 1991).

Indeed, no published Colorado case has held, as the *Townsell* Division held, that section 18-1.3-406(1)(a) automatically prevails over section 18-1-408(3). This is because this Court has analyzed the legislative history of both statutory provisions and concluded that the General Assembly intended that they interplay. *See Marquez*, ¶ 11, 311 P.3d at 269. "[T]he general provision of section 18-1-408(3), which authorizes discretionary consecutive sentences in multi-victim cases, can be reconciled with section 18-1.3-406(1)(a), which requires consecutive sentencing for 'separate crimes of violence.'" *Espinoza*, ¶ 26; *see Jurado*, 30 P.3d at 773 (sections 18–1–408(3) and 18-1.3-406(3) must be construed together).

For over a decade, this Court has "construed section 18-1-408(3)[,C.R.S.] to mandate the imposition of concurrent sentences in a multiple count situation when the counts are based on the same act or series of acts arising from the same criminal episode and the evidence supporting the counts is identical." *Juhl v.*

7

*People*, 172 P.3d 896, 901 (Colo. 2007).  The *Juhl* Court went on to explain, "Our caselaw has consistently applied the statute by analyzing the evidence to determine if the separate convictions were based on more than one distinct act and if so, whether those acts were separated by time and place."  *Id.*  When applying this rule and analyzing the evidence, "separately named victims do not create separate crimes of violence under section 18-1.3-406(1)(a)[, C.R.S.] when identical evidence supports each conviction, and in such circumstances, a court retains discretion to impose concurrent sentences under section 18-1-408(3)[, C.R.S.]."  *Espinoza*, ¶ 26.

### B.  The District Court Erroneously Believed That It Did Not Have Discretion to Impose Concurrent Sentences

The district court abused its sentencing discretion because it misapplied the law.  *See People v. Garrison*, 2017 COA 107, ¶ 30, 411 P.3d 270, 277 (a court abuses its discretion when it misunderstands or misapplies the law); *see also Espinoza*, ¶ 41 (trial court erred when it found that consecutive sentences were mandatory).

The district court determined that the "circumstances arise out of the same incident." (TR 5/12/14, p 50: 12).  The district court highlighted the key evidence: "it was a single bank robbery occurring within approximately 60 seconds." (*Id.* at

8

p 49:17-18).  The district court clarified, "The Court is not confronted with the circumstances in [*Marquez v. People*, 2013 CO 58, 311 P.3d 265], where there was a crime spree occurring over 12 to 24 hours, but rather a single incident."  (*Id.* at ll: 18-21).  But the district court "believe[d] that consecutive sentencing [was] required" because "there are clearly different victims."  (*Id.* at p 50:10-16).

The record demonstrates that the district court would have imposed concurrent sentences if it felt it had the authority to do so.  The district court first discussed whether it had discretion to order consecutive sentences and held that it had such authority: "Here, multiple victims are involved.  So, the Court clearly has discretion to sentence the defendant consecutively on Count 1 and Count 2."  (TR 5/12/14, p 46: 17-19).  If the district court had intended to impose consecutive sentencing based on its discretion to do so, it would have stopped the analysis at that point and simply imposed consecutive sentences.  However, the district court then stated, "[t]he question is whether the Court is required to impose consecutive sentencing pursuant to [section] 18-1.3-405, the crime of violence statute."  (*Id.* at p 47: 2-4).  The district court concluded "consecutive sentencing is required in this case."  (*Id.* at p 50: 15-16).  Because the district court abused its discretion in concluding that consecutive sentencing was mandated by the statute, the consecutive sentence should be vacated.

9

## II.	The Division Decided Contrary to This Court's Decision in *People v. Goldsberry*, 181 Colo. 406, 409, 509 P.2d 801, 803 (1973), that the Prosecutor's Elicitation of Mr. Townsell's Prior Incarceration Was Harmless

### A.  The Prosecutor Elicited Testimony That Mr. Townsell Was Previously Incarcerated

Mr. Townsell's estranged wife's mother testified in his case-in-chief to support his alternate suspect defense.  (TR 3/17/14, p 173:21-25).  During direct examination, the mother-in-law gave unsolicited testimony that Mr. Townsell and her daughter were married "inside the jail."  (TR 3/17/14, p 173:18-20).  To avoid highlighting the comment, defense counsel quickly changed subjects.  On cross-examination, the prosecutor established that the couple was married in 2008 or 2009 – three to four years before the trial.  (TR 3/17/14, p 191:14-17).  The prosecutor then continued to ask questions about the ceremony until the witness responded, "I guess they got married in jail while he was still in jail."  (TR 3/17/14, p 191:21– p 192:1).

Defense counsel moved for mistrial, stating, "It was clear that the whole issue of the date of marriage was waiting for a ticking time bomb."  (TR 3/17/14, p 193:2-6).  The district court denied the motion and instructed the jury, "The witness . . . identified the place of marriage between Mr. Townsell and Ms. Ruffin

10

Townsell; namely, that was the jail.  I want you to put that entirely out of your mind as if the testimony and the question had never been asked and the response never given."  (TR 3/17/14, p 202:6-18).

   B.  Longstanding Colorado Case Law Establishes that References to Prior Criminality Elicited by the People Cannot be Cured by an Instruction

This Court has repeatedly stated that references to a defendant's prior criminality create reversible error.  *People v. Goldsberry*, 181 Colo. 406, 409, 509 P.2d 801, 803 (1973); *see also Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1090-91 (Colo. 2011) ("inadmissible evidence of the defendant's criminal activity" cannot be cured by an instruction when proof of guilt is not overwhelming); *Edmisten v. People*, 176 Colo. 262, 275-77, 490 P.2d 58, 64-65 (1971) (when evidence is not overwhelming, introduction of prior criminality evidence causes reversible error and cannot be cured by an instruction).  Aptly explained, "[e]vidence of criminal activity other than that for which the defendant is being tried has an inherent tendency to prejudice the jury against the defendant and induce it to find him guilty on the basis of his past activities rather than on the basis of the crime charged."  *People v. Elmarr*, 2015 CO 53, ¶ 35, 351 P.3d 431.

The prosecutor's questioning leading to the witness's clear and damaging statement "while [Mr. Townsell] was still in jail" highlights the concerns first

11

articulated by the *Goldsberry* Court and repeatedly discussed by this Court and other divisions of the court of appeals. First, the statement was clear and unambiguous. There was no question what the witness meant; she testified that Mr. Townsell was in jail. Second, the statement was unquestionably about a prior incident because the prosecutor elicited that the marriage occurred in 2008 or 2009 (TR 3/17/14, p 191:14-17). Third, and most importantly, the statement was elicited by the prosecution. As explained by trial counsel, this "whole issue of the date of marriage was waiting for a ticking time bomb" after the witness's initial nonresponsive answer. (TR 3/17/14, p 193:5-6).

These concerns are exactly those expressed by the *Goldsberry* Court. It was clear from the record that the witness would respond to the prosecutor's question as she did. The prosecutor pushed the witness for details of the wedding ceremony, asking, "There wasn't a ceremony that you attended?" (TR 3/17/14, p 191: 21). The witness replied, "No." (*Id.* at l. 22). The prosecutor continued to push, "Were they -- do you know whether there was a ceremony or married under common law?" (*Id.* at ll. 23-24). At this point the witness responded, "I guess they got married in jail while he was still in jail. Like I said, it was Easter Sunday." (*Id.* a p 191: 25 – 192: 1). Given this record, it is clear that the prosecutor knew the witness would respond as she did. Likewise, in *Goldsberry*,

12

"It appear[ed] from the record of [the] case that the district attorney was fully

cognizant that the prosecution witness would respond in the manner he did and

thus, expose to the jury inadmissible and highly prejudicial evidence." 181 Colo.

at 411, 509 P.2d at 804. A mistrial was required.

### C.  Because the Physical Description of the Robbery Suspect Substantially Differed From Mr. Townsell, the Prior Jail Reference Created Reversible Error and Could Not be Cured by an Instruction

The impact of the jail reference was significant given the glaring

discrepancies in the evidence. Identity was the sole jury issue and the robber's

physical characteristics do not match Mr. Townsell. As established by the

People's evidence — including both the senior corporate security investigator and

the police officer who reviewed the surveillance video and used stationary items in

the bank to determine height — the suspect in this case was between 5'7" and 5'9"

tall. The eyewitness, who calmly dialed 911 and reported the incident after

watching the robbery from his desk, testified that the robber was 5'8" or 5'9". All

of the witness testimony consistently put the suspect at approximately 5'8". Mr.

Townsell is 6'2" tall. That difference is dramatic.

Additionally, the robber was so predominantly left-handed that he switched

the gun from his left hand to his right hand so that he could remove the cash from

the drawer with his left hand. Yet the record established that Mr. Townsell is right

13

handed.  (TR 3/17/14, p 42:12-16).

Coupled with an alternate suspect defense, the record demonstrates very thin evidence of guilt.  Although the People relied on DNA evidence of items found near the stolen money, it is also important to note that those items were found in the trunk of Mr. Townsell's wife's car and near his gym bag.  Though the couple was no longer living together, they shared a child and Mr. Townsell's gym bag containing his personal items was found in her trunk.  DNA evidence could have transferred from his gym clothes or the alternate suspect (Mr. Townsell's brother-in-law) could have used some of Mr. Townsell's clothing while committing the robbery.

Given such thin evidence of guilt, the jury's knowledge of prior criminality weighs heavily against Mr. Townsell.  In this case, like in *Goldsberry*, "it is conceivable that but for its exposure [to Mr. Townsell's prior incarceration], the jury may not have found the defendant guilty."  *Goldsberry*, 181 Colo. at 410, 509 P.2d at 803; *see also Qwest Servs. Corp.*, 252 P.3d at 1091.

**III.  The Court of Appeals Conclusion That the Evidence Was Sufficient to Sustain the Aggravated Robbery Conviction as to M.O. is Not in Accord With *People v. Borghesi*, 66 P.3d 93 (Colo. 2003); or *People v. Bartowsheski*, 661 P.2d 235, 244 (Colo. 1983); and Contradicts *People v. Ridenour*, 878 P.2d 23**

14

**(Colo. App. 1994)**

A.  A Robbery Conviction Requires Physical Force Directed at a Victim Who Has Close Proximity to the Stolen Items and a Right to Control the Stolen Items

"The gravamen of robbery is the *application of physical force or intimidation against the victim* at any time during the course of a transaction culminating in the taking of property from the victim's person or presence." *People v. Bartowsheski*, 661 P.2d 235, 244 (Colo. 1983) (emphasis added).  Thus, force or threats must be directed at each named victim for convictions involving multiple victims to stand.  *People v. Borghesi*, 66 P.3d 93, 103 (Colo. 2003).

"Property is taken from the 'presence of another' when it is so within the victim's reach, inspection or observation that he or she would be able to retain control over the property but for the force, threats, or intimidation directed by the perpetrator against the victim." *Bartowsheski*, 661 P.2d at 244.  To take property from someone's "presence," that person "must be exercising, or have the right to exercise, control over the article taken." *People v. Benton*, 829 P.2d 451, 453 (Colo. App. 1991).

When there is no trial evidence to establish that an employee has access to or could exercise control over the item taken, the evidence is insufficient to support a robbery conviction.  *See People v. Ridenour*, 878 P.2d 23, 27 (Colo. App. 1994).

15

In *Ridenour*, 878 P.2d at 27, the division held that a movie ticket taker "did not have physical possession of the money taken" and "no evidence showed that he had the right to exercise control over that money." Therefore, "the evidence presented could not support the finding that he was in possession of or had control over the money taken—an element necessary to be established in order to prove that he was the victim of an aggravated robbery." *Id.* The employee's testimony did not establish the right to exercise control over the money so the conviction was vacated. *Id.*

### B. No Evidence Established That Force Was Directed at M.O. or That M.O. Had Any Right to Control the Stolen Money

First, the robber did not direct force towards M.O. The record establishes that the robber sprinted through the bank lobby while M.O. sat at his desk, which was obstructed by a cubicle divider. (EX 1). M.O. remained calm and testified that he was not afraid during the robbery because the robber never looked in M.O.'s direction or otherwise indicated that he knew M.O. was at his desk. (TR 3/12/14, p 95:14-20). The robber did not turn his head towards M.O. or interact with M.O. in any way. (*Id.*) M.O. testified that the robber left the bank "just as fast as he came in . . . [and] ran out the front door." (TR 3/12/14, p 96:17-19).

Second, the record contained no evidence that M.O. had any right to control

16

the money in K.K.'s drawer.  M.O. testified that he was a "financial services consultant" and was "[r]esponsible for personal and business checking accounts, savings accounts, loans, money markets, auto loans[,]" but he did not testify that he had any right to control the money in K.K.'s drawer.  (TR 3/12/14, p 92:13-18). Thus, like in *Ridenour*, the evidence here is insufficient to sustain the conviction. *Ridenour*, 878 P.2d at 27.

## CONCLUSION

Mr. Townsell respectfully requests that this Court grant his petition for writ of certiorari to review *People v. Townsell*, 14CA1225, Apr. 5, 2018 (not published pursuant to C.A.R. 35(f)).

Respectfully submitted,

s/ Krista A. Schelhaas
Krista A. Schelhaas, #36616

17

## CERTIFICATE OF SERVICE

I certify that on the 7th day of June 2018, a true and correct copy of the

foregoing PETITION FOR WRIT OF CERTIORARI was filed through the

Integrated Colorado Courts E-Filing System (ICCES), with a copy checked to be

sent to the Office of the Attorney General, Criminal Division.

<u>s/ Krista A. Schelhaas</u>
Krista A. Schelhaas



ATTACHMENT
A

14CA1225 Peo v Townsell 04-05-2018

COLORADO COURT OF APPEALS

DATE FILED: April 5, 2018
CASE NUMBER: 2014CA1225

Court of Appeals No. 14CA1225
Arapahoe County District Court No. 13CR2039
Honorable Kurt A. Horton, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jamale D. Townsell,

Defendant-Appellant.

JUDGMENT AND SENTENCES AFFIRMED

Division VI
Opinion by JUDGE FOX
Furman and Ashby, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 5, 2018

Cynthia H. Coffman, Attorney General, Brock J. Swanson, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Krista A. Schelhaas, Alternate Defense Counsel, Littleton, Colorado, for Defendant-Appellant

¶ 1     Defendant, Jamale D. Townsell, appeals the judgment of conviction entered on jury verdicts finding him guilty of theft, two aggravated robbery counts, and two menacing counts.  We affirm.

## I.     Background

¶ 2     A masked man entered a bank lobby where two bank employees — K.K. and M.O. — were present.  The man, later identified as Townsell, yelled "nobody fucking move," jumped over the teller counter, pointed a gun at bank teller K.K., and demanded money.  He placed $1104 — containing a concealed global positioning system (GPS) device — from K.K.'s teller drawer into a bag hanging from his neck and shoulder.  Townsell then jumped over a counter and exited the bank.  The robbery lasted about twenty-eight seconds from Townsell's entry to his exit.  Townsell then entered a stolen car parked in the bank's parking lot and drove to a nearby apartment complex, where he abandoned the car.

¶ 3     Meanwhile, police officers tracking the GPS device contacted E.R., Townsell's wife, in her car.  In the trunk of her car, officers found a gun and one shoe.  In the middle of a nearby street, officers found a bag containing, among other things, a sweatshirt, a bandana, one shoe, money, the GPS device, a mask, a pair of

1

pantyhose, and gloves.  The police took E.R.'s cellular phone and obtained phone records showing that Townsell's phone called E.R.'s phone shortly before and after the robbery while the two phones were close to the bank and to each other.

¶ 4        Townsell was later arrested and charged with six counts: theft, possession of a weapon by a previous offender, aggravated robbery and menacing concerning K.K., and aggravated robbery and menacing concerning M.O.  At trial, Townsell denied participating in the robbery and offered evidence of an alternate suspect, E.R.'s brother.  The prosecutor offered evidence showing that Townsell's deoxyribonucleic acid (DNA) matched DNA found on the shoes, pantyhose, bandana, and mask seized by police.  A jury found Townsell guilty of theft, two aggravated robbery charges, and two menacing charges.

¶ 5        The trial court gave Townsell consecutive sentences of twenty-two years in the custody of the Department of Corrections (DOC) for aggravated robbery concerning K.K. and ten years for aggravated robbery concerning M.O.  The court also sentenced Townsell to six years in DOC custody for menacing K.K., two years

2

for menacing M.O., and eighteen months for theft, to run concurrently.

## II.   DNA Match Evidence: Statistical Significance

¶ 6   Townsell argues that the trial court plainly erred in allowing an expert to testify that Townsell's DNA matched DNA found on the shoes, bandana, mask, and pantyhose without requiring evidence of the match evidence's statistical significance.  We are not persuaded.

## A.   The DNA Expert's Testimony

¶ 7   The trial court qualified, without objection, a laboratory agent from the Colorado Bureau of Investigation as an expert in forensic DNA analysis.  The expert testified that, when conducting the subject forensic DNA analysis, she examined nuclear DNA — found on items including the shoes, pantyhose, bandana, and mask — focusing on sixteen locations in the DNA strand to create a DNA profile.  According to the expert, a person's DNA profile is unique (unless the person is an identical twin).

¶ 8   After creating the DNA profile, the expert stated that she conducts "comparisons between evidence samples and known samples.  If there is [a] matc[h] between those comparisons, I then may perform statistical calculations [or] analys[e]s to see how rare

3

that profile is or how often I would find that profile in the population."  She then differentiates the rate of frequency of a DNA profile among "Caucasians, African-Americans, and Southwestern Hispanics" for greater accuracy.  The following exchange occurred between the prosecutor and the expert:

> Q[.:] Are there DNA profiles that you can generate which are so unique that you are able to . . . identify who the contributor of the DNA actually is?

> A[.:] Yes.  So we can get statistics that are very rare, and so low that we can call it source attribution[, which] means . . . if we get a statistic that is less than 1 in 300 billion, we can say that individual contributed that DNA, so they are the source from a DNA profile for that particular item.

¶ 9    The expert testified that she obtained

- a "partial profile" — meaning she obtained a DNA profile at thirteen of the sixteen locations in the DNA strand — from the left shoe;

- a full profile — meaning she obtained a DNA profile at all sixteen locations in the DNA strand — from the pantyhose sourced from a single person;

4

- a full profile from the bandana sourced from a single person;

- a "mixed" profile from the mask (a knit hat with two holes cut into it) — meaning multiple people (a major and a minor contributor) left DNA on the mask. The expert obtained a full profile from the major contributor which was consistent with the profile from the left shoe, pantyhose, and bandana. But, the expert was only able to obtain a partial profile — at three of the sixteen locations — from the minor contributor, which was insufficient to "make any interpretations" regarding the minor contributor; and

- a full profile from the right shoe sourced from a single person that "matched all the other profiles obtained."

¶ 10    After comparing Townsell's DNA profile to the profile found on the items, the expert concluded that Townsell's profile matched, and "is the source of," the DNA profile from the right shoe. The expert also determined that Townsell's profile matched, and was the source of, the partial profile from the left shoe. The prosecutor asked whether the expert was able to identify Townsell as the partial profile's source, and the expert responded, "Yes, I am. I still

get a statistic that is more rare than 1 in 300 billion." The expert

further concluded that Townsell's profile matched, and was the

source of, the profiles from the pantyhose and bandana. His profile

also matched the mask's major contributor's profile.

¶ 11    Defense counsel neither objected to this testimony nor

disputed that Townsell's DNA was found on the items at issue.

### B.    Preservation and Standard of Review

¶ 12    The parties agree that this issue was not preserved.

¶ 13    We review a trial court's evidentiary rulings for an abuse of

discretion. *People v. Relaford*, 2016 COA 99, ¶ 25; *see also People*

*v. Pahl*, 169 P.3d 169, 182 (Colo. App. 2006) ("A trial court has

broad discretion to determine the admissibility of expert testimony

under CRE 702, and the exercise of that discretion will not be

overturned on appeal absent an abuse of discretion."). An abuse of

discretion occurs when a trial court's ruling is manifestly arbitrary,

unreasonable, or unfair, or if it misapplies the law. *Relaford*, ¶ 25.

¶ 14    We review unpreserved claims for plain error. *See People*

*v. Acosta*, 2014 COA 82, ¶ 77. Plain error is obvious and

substantial. *Hagos v. People*, 2012 CO 63, ¶ 14. Reversal is

required under this standard only if the error "so undermined the

fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Id.* (citation omitted).

## C.    Law and Analysis

¶ 15    "The admission of expert testimony about DNA evidence is governed by CRE 702 and 403." *People v. Marks*, 2015 COA 173, ¶ 24. CRE 702 states, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Evidence admitted under CRE 702 must be reliable and relevant. *Marks*, ¶ 26 ("DNA evidence is ordinarily useful to the jury because it tends to make it more or less probable that the defendant is connected to the crime."); *see also* CRE 401 (Relevant evidence tends to make the existence of any fact of consequence "more probable or less probable than it would be without the evidence."); CRE 403 (Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice.").

7

¶ 16    The relevance of evidence indicating whether a defendant is the source of a certain DNA sample generally depends on whether the evidence is accompanied by a determination of its statistical significance.  *See Fishback v. People*, 851 P.2d 884, 893 n.18 (Colo. 1993) ("[A] declared [DNA] match, unaccompanied by its statistical significance, is essentially meaningless."), *abrogated on other grounds by People v. Shreck*, 22 P.3d 68 (Colo. 2001); *Marks*, ¶¶ 28-30 (noting that evidence that a defendant is a "possible match" to a given DNA sample is generally irrelevant and "meaningless" if unaccompanied by statistical data showing how likely it is that a defendant is the source of the DNA at issue) (citation omitted); *cf. People v. Rojas*, 181 P.3d 1216, 1222 (Colo. App. 2008) (concluding that a trial court properly allowed evidence that the victim could not be excluded as a possible match to DNA found on the defendant's penis where accompanying statistical data showed that 99.6% of the population could be excluded; the evidence was therefore relevant to whether the defendant had sexual contact with the victim).

¶ 17    Here, the expert testified that, to identify the source of a DNA profile, statistical analysis must show that the profile occurs in less

8

than one in three hundred billion people in the surrounding

population.  She then testified that Townsell was the source for the

DNA profiles from the shoes, bandana, pantyhose, and mask.

Concerning the left shoe's partial DNA profile, the expert stated that

she identified Townsell as the source because the subject DNA

profile "is more rare than 1 in 300 billion."  The expert explained

the match evidence's statistical significance and, thereby, the

likelihood that Townsell is the source for the DNA profile found on

items that the robber reportedly wore during the robbery.  *See*

*Marks*, ¶ 39 (Without an indication of statistical significance, "a jury

does not know what to make of the fact that a person's DNA pattern

is a possible match to the DNA evidence samples; 'the jury does not

know whether the patterns are as common as pictures with two

eyes, or as unique as the Mona Lisa.'") (citation omitted).  Notably,

except for the DNA from the mask, the DNA from the items came

from a single male, and there was no evidence of DNA from any

female — including E.R. — on the items.

¶ 18    The DNA evidence, the accompanying statistical analyses, and

the circumstances surrounding the police's discovery of the items

tended to make it more likely that Townsell was connected to the

9

robbery.  *See* CRE 401.  Accordingly, the trial court did not commit error, plain or otherwise, in allowing the challenged evidence.  *See Acosta*, ¶ 14; *Pahl*, 169 P.3d at 182.

### III.    DNA Match Evidence: Alleged Discovery Violation

¶ 19    While Townsell concedes that the DNA match evidence concerning the pantyhose was timely disclosed in an expert report in January 2014, he asserts that the trial court erroneously allowed evidence that his DNA matched DNA found on the shoes, bandana, and mask because the prosecution untimely disclosed the expert report containing this information in February 2014.  We discern no such error.

### A.    Preservation and Standard of Review

¶ 20    On March 13, 2014, while objecting to other evidence not challenged on appeal, defense counsel mentioned the allegedly late disclosure of the February 2014 expert report.  The trial court, however, made no ruling concerning the February 2014 report.  The next day, defense counsel repeated his objection to the February 2014 report and related DNA match evidence concerning the shoes, bandana, and mask.  The trial court stated that it was "not able to make a ruling" concerning the February 2014 report and the

challenged DNA match evidence, so it deferred ruling.  Following a recess, defense counsel failed to seek a ruling concerning the alleged discovery violation involving the February 2014 expert report, and defense counsel did not contemporaneously object to the challenged DNA match evidence when it was offered.  In spite of defense counsel's failure to obtain a final ruling on the matter, the trial court did not err in allowing the challenged DNA match evidence because this evidence was timely disclosed in the January 2014 expert report.

¶ 21   "In the event that a discovery violation is found, the decision whether to impose a sanction is within the sound discretion of the trial court." *People v. Lee*, 18 P.3d 192, 196 (Colo. 2001).  Such a ruling will not be disturbed absent an abuse of discretion.  *Id.*; *Relaford*, ¶ 25.  We defer to the trial court's findings of fact if they are supported by competent evidence in the record and review the trial court's legal conclusions de novo.  *People v. Blessett*, 155 P.3d 388, 393 (Colo. App. 2006); *see also Acosta*, ¶ 14.

B.   Law and Analysis

¶ 22   Crim. P. 16(I)(a)(1)(III) requires the prosecution to make available to the defense certain materials in its possession,

11

including "[expert] reports . . . made in connection with the particular case, including results of . . . scientific tests, experiments, or comparisons."  The prosecution must make such a disclosure "as soon as practicable but not later than 35 days before trial."  Crim. P. 16(I)(b)(3).  If, after complying with Crim. P. 16(I)'s disclosure requirements, the prosecution "discovers additional material or information which is subject to disclosure," it "shall promptly notify" the defendant or his counsel.  Crim. P. 16(III)(b).

¶ 23    Here, the record supports the trial court's finding that the timely disclosed January 2014 expert report demonstrated that Townsell's DNA profile matched profiles from the pantyhose and other items.  A portion of the January 2014 report (dated August 22, 2013) states that

- DNA profiles "indicative of the same unknown male donor" were developed from the pantyhose, bandana, and right shoe;

- the partial DNA profile developed from the left shoe "is indicative of the same unknown male donor from" the pantyhose, bandana, and right shoe; and

12

- the major contributor's DNA profile from the mask "is indicative of the same unknown male donor from" the shoes, pantyhose, and bandana.

A portion of the January 2014 expert report (dated August 26, 2013) states that

- the DNA profile from the pantyhose matched Townsell's DNA profile from the Convicted Offender Index (COI); and

- the DNA profile from the left shoe matched the DNA profile from the pantyhose and Townsell's COI DNA profile.

¶ 24   The January 2014 report states that (1) a single male's DNA profile matched the profile from the shoes, bandana, mask, and pantyhose; (2) only one person's DNA was found on the pantyhose; and (3) Townsell's COI DNA profile matched the profile from the pantyhose and left shoe. The record indicates that the prosecution timely, albeit convolutedly,[1] disclosed the expert's determination that Townsell's DNA profile matched DNA found on the pantyhose,

---

[1] The February 2014 expert report contained the results of a buccal (inner cheek) swab DNA test confirming that Townsell's DNA profile matched the profiles from the pantyhose and other items. The record indicates that the buccal swab was performed so the prosecution could present DNA match evidence without referring to Townsell's DNA profile's presence in the COI or his related prior convictions.

bandana, mask, and shoes.  *See* Crim. P. 16(I)(a)(1)(III), (b)(3).

Thus, finding no discovery violation from any untimely disclosure of

expert reports, the trial court did not err in allowing the challenged

evidence.  *See Relaford*, ¶ 25; *Blessett*, 155 P.3d at 393.

### IV.    Motion for a Mistrial

¶ 25    Townsell next contends that the trial court erred in failing to

declare a mistrial after E.R.'s mother referenced his prior

incarceration.  According to Townsell, a curative instruction could

not cure the harm from the challenged testimony, the prosecutor

intentionally elicited said testimony, and the evidence of Townsell's

guilt was not overwhelming.  We are not persuaded.

### A.    Additional Facts

¶ 26    At trial, defense counsel asked J.S., E.R.'s mother, whether

E.R. was married to Townsell.  J.S. replied, "If it's legal inside the

jail, yes."  The following exchange later occurred between J.S. and

defense counsel:

> Q[.:] So far as you knew at the time [of the
> robbery were] your daughter, [E.R.], and
> [Townsell] living together?
>
> A[.:] So far as I know, yes and no.
>
> Q[.:] Yes and no?

14

> A[.:] Yes and no.
>
> Q[.:] [W]as [Townsell] a good husband?
>
> A[.:] I take the [F]ifth. . . .
>
> Q[.:] [Y]ou said yes and no when I asked you if [Townsell] was living at [E.R.'s]. Why did you say that?
>
> A[.:] I stayed there a week, and he didn't stay there. . . .
>
> Q[.:] And isn't it true that you told the police . . . that [E.R.] and [Townsell] lived in an apartment in Aurora?
>
> A[.:] No, I did not.

¶ 27    The prosecutor later asked J.S. whether Townsell was the father of E.R.'s daughter. J.S. said, "Yes. Right after June of 2012 when we got back from Louisiana, my daughter told me they was pregnant, and they were together supposedly." The following exchange later occurred:

> Q[.:] But you denied telling Detective Hansen that [Townsell] and [E.R.] lived together in an apartment in Aurora?
>
> A[.:] He asked me about [E.R.]. No, I asked him. He wouldn't tell me anything. . . . [N]o, I didn't tell him — well, I told him he was married. So I guess he figured because of the first thing I asked is, "Where is her husband?"

15

Q[.:] And when did [E.R.] and [Townsell] get married?

A[.:] God only knows.  It was in 2000, and I'm trying to think — 2008 — -9.  She might have told me.  She took me out for Easter dinner, and as we were leaving the theater, she said, "Guess what mom?  I'm married."  That's all. That's how I learned about it.

Q[.:] There wasn't a ceremony that you attended?

A[.:] No.

Q[.:] Were they — do you know whether there was a ceremony or married under common law?

A[.:] I guess they got married in jail while he was still in jail.  Like I said, it was Easter Sunday.  The three girls took me out to lunch, and I was told when they were leaving the theater.

¶ 28    Later, defense counsel moved for a mistrial, arguing that, after J.S.'s comments on direct examination about marriage and jail, "[i]t was clear that the whole issue of the date of marriage was . . . a ticking time bomb."  Defense counsel then stated,

> The date of the marriage was the least important thing that could have been asked on the cross-examination, and the prosecutor just kept on going over it until we got this witness to say that my client had been in jail.  And it clearly was eliciting that, and there is no way for me to stand up and object because the cat

16

was out of the bag.  And I think it was purposefully elicited, so I'm asking for a mistrial.

The prosecutor responded that, "given the vagueness of their marriage," she assumed that E.R. and Townsell "were just common law married and only somewhat recently[.]"  According to the prosecutor, she was trying to elicit testimony that E.R. and Townsell were cohabiting at the time of the robbery, which was relevant and related to J.S.'s denial that she told the police that Townsell and E.R. lived together.  Defense counsel requested a limiting instruction if the trial court refused to grant a mistrial.

¶ 29    The trial court determined that "it did not appear [that the prosecutor was] intending to elicit that particular response as opposed to something that arguably would be relevant on marital relations, marital privilege, bias, motive."  Consequently, the trial court declined to declare a mistrial, but later issued the following curative instruction:

> I had advised you earlier . . . that there would [b]e instances where the Court would instruct you to disregard something that might be stated by a witness.  I do want to address that now.  [J.S.] identified the place of marriage between [T]ownsell and [E.R.]; namely, that was the jail.  I want you to put that entirely

17

out of your mind as if the testimony and the question had never been asked and the response never given.  And are you able to do that?  I'm looking now for your nods on this.  So it's as if you had never heard that.  And I see nods from members of the jury.

### B.   Preservation and Standard of Review

¶ 30    We determine that this issue was properly preserved.  Further we reject the prosecution's argument that appellate review of this issue is barred by the doctrine of invited error.  *See People v. Foster*, 2013 COA 85, ¶ 25 ("The doctrine of invited error captures the principle that 'a party may not complain on appeal of an error that he has invited or injected into the case; he must abide by the consequences of his acts.'") (citation omitted).  J.S. stated, "If it's legal inside the jail, yes," in response to defense counsel's questioning whether Townsell and E.R. were married.  It was unclear at that point whether J.S. was referring to Townsell's incarceration for this case — where it was clear to the jury that Townsell was incarcerated during the entire trial — or for a previous case.  But, the record indicates that the prosecutor, not defense counsel, elicited the challenged facts — that E.R. married Townsell in jail while he was incarcerated in 2008 or 2009.  Accordingly,

18

defense counsel did not invite any error arising from the challenged testimony.

¶ 31    We review a trial court's decision to deny a mistrial for an abuse of discretion. *People v. Marko*, 2015 COA 139, ¶ 29 (*cert. granted on other grounds* Oct. 24, 2016). An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair, or contrary to law. *Relaford*, ¶ 25. "Under the abuse-of-discretion standard, an appellate court must affirm the trial court's decision if there is any evidence in the record to support the trial court's finding." *People v. Muckle*, 107 P.3d 380, 383 (Colo. 2005). Moreover, the "trial court is in a better position to evaluate any adverse effect of improper statements or testimony on a jury, [so] it has considerable discretion to determine whether a mistrial is warranted." *People v. Tillery*, 231 P.3d 36, 43 (Colo. App. 2009), *aff'd sub nom. People v. Simon*, 266 P.3d 1099 (Colo. 2011).

¶ 32    We review an erroneous reference to a defendant's prior criminality for nonconstitutional harmless error. *People v. Salas*, 2017 COA 63, ¶ 10.

C.    Applicable Law

¶ 33    Because a mistrial is the most drastic of remedies, one is "only

warranted where the prejudice to the accused is too substantial to

be remedied by other means." *People v. Collins*, 730 P.2d 293, 303

(Colo. 1986).  Factors relevant to whether a mistrial is warranted

include the nature of the inadmissible evidence, the weight of the

admissible evidence of the defendant's guilt, and the value of a

cautionary instruction.  *People v. Vigil*, 718 P.2d 496, 505 (Colo.

1986); *Tillery*, 231 P.3d at 43.

¶ 34    Generally, a curative instruction issued after a prejudicial

statement is made remedies any harm caused by the statement.

*People v. Mersman*, 148 P.3d 199, 203 (Colo. App. 2006).  A jury is

presumed to have followed a curative instruction to disregard

improper testimony.  *Tillery*, 231 P.3d at 43.  "Such an instruction

is inadequate only when the improper testimony or statements are

so prejudicial that, but for the exposure, the jury might not have

found the defendant guilty."  *Id.*; *see also People v. Everett*, 250 P.3d

649, 663 (Colo. App. 2010).  Inadmissible evidence typically will

have less prejudicial impact if it appears only in a fleeting reference.

*See People v. Lahr*, 2013 COA 57, ¶ 24.

20

¶ 35  "[E]vidence of a defendant's criminal activity, which is unrelated to the offense charged, is inadmissible." *People v. Goldsberry*, 181 Colo. 406, 409, 509 P.2d 801, 803 (1973) (concluding that a curative instruction could not cure the prejudice from testimony of the defendant's prior criminality where the prosecutor intentionally elicited the information, evidence of guilt was "thin," and the proof of at least one of the charge's essential elements was entirely circumstantial).  But, an "ambiguous reference to evidence of a defendant's criminality does not necessitate a new trial." *Lahr*, ¶ 24; *see also Salas*, ¶ 18 (determining that "ambiguous" testimony of the defendant's prior criminality did not warrant a mistrial where the "remark was fleeting, minimally prejudicial, and immediately followed by a curative instruction," and the prosecution did not intentionally elicit the improper testimony); *People v. Ellis*, 30 P.3d 774, 777-78 (Colo. App. 2001) (concluding that court's instruction was sufficient to cure prejudice from a victim's testimony that the defendant had "shot a brother before").

21

### D.    Analysis

¶ 36    We perceive no error in the trial court's refusal to declare a

mistrial.  The trial court's finding that the prosecutor did not

intentionally elicit the challenged testimony enjoys record support

— including (1) the prosecutor's explanation for inquiring about

E.R.'s and Townsell's marriage and living situation and (2) J.S.'s

testimony implying that E.R. and Townsell were not living together

at the time of the robbery — and we will not disturb it.  *See Muckle*,

107 P.3d at 383.  And, the challenged testimony was relatively

fleeting, constituting only a few lines in the transcript of the six-day

trial.  *See Salas*, ¶ 18; *Lahr*, ¶ 24.

¶ 37    Moreover, the challenged reference was ambiguous as to

Townsell's prior criminality.  J.S. only mentioned that Townsell was

in jail in 2008 or 2009, but she did not reference how long Townsell

was incarcerated, whether he was ever convicted in a prior criminal

proceeding, or the nature of any previous criminal charges.  As the

jury was instructed here, criminal defendants are presumed

innocent until proven guilty beyond a reasonable doubt; thus, the

jury could have inferred that Townsell may have been incarcerated

without ever being convicted of a crime.  *See Salas*, ¶ 18; *Tillery*,

22

231 P.3d at 43.  Further, we note the strength of the properly admitted evidence of Townsell's guilt — such as the DNA match evidence, the bank surveillance video of the robbery, evidence found in and near E.R.'s car, the GPS device's location, Townsell's and E.R.'s phone records, K.K.'s statements (whose admissibility we address below), and M.O.'s eyewitness testimony.  *See Salas*, ¶ 18; *Lahr*, ¶ 24.

¶ 38    In light of the foregoing — coupled with the trial court's prompt curative instruction, *see Mersman*, 148 P.3d at 203 — we will not disturb the trial court's determination that its instruction was sufficient to cure any prejudice from the challenged testimony. *Compare Goldsberry*, 181 Colo. at 409, 509 P.2d at 803 (reversing trial court's refusal to order mistrial where the prosecutor intentionally elicited the information, evidence of guilt was "thin," and the proof of at least one of the charge's essential elements was entirely circumstantial), *with Salas*, ¶ 18, *and Ellis*, 30 P.3d at 778. Accordingly, the trial court did not err in declining to declare a mistrial.  *See Relaford*, ¶ 25; *Marko*, ¶ 29.

## V.     Hearsay and Confrontation

¶ 39     Townsell argues that the trial court reversibly erred in allowing a police officer's testimony concerning K.K.'s statements to police because the challenged statements were (1) inadmissible hearsay and (2) testimonial hearsay admitted in violation of Townsell's confrontation rights, as he had no prior opportunity to cross-examine K.K.  We discern no reversible error.

### A.     Additional Facts

¶ 40     At a February 28, 2014, hearing, the prosecutor stated that K.K. would be unavailable to testify at trial, scheduled to begin in March 2014.

¶ 41     The second day of trial, a police officer testified about his interview of K.K. shortly after the robbery.  The officer described K.K. as "very upset," "petrified," and having trouble breathing and speaking.  Defense counsel objected, arguing that any more testimony about K.K.'s emotional "state" immediately following the robbery would be cumulative and unduly prejudicial.  The prosecutor responded that he was "laying a foundation for an excited utterance."  Defense counsel then argued that the officer's testimony concerning K.K.'s statements made during the police

24

interview at issue were not excited utterances because too much time had passed between the robbery and the interview. The court overruled the objection.

¶ 42    The officer continued to testify about K.K.'s state following the robbery. The prosecutor then asked the officer about K.K.'s statements to the officer describing the robbery. Before the officer could answer, defense counsel objected on hearsay grounds. The trial court overruled the objection, determining that the subject statements were "not too distant in time" and that a sufficient foundation had been laid to show that the statements were excited utterances.

¶ 43    The officer then testified that K.K. told him the following:

- The robber was a masked male wearing a long-sleeved shirt, jeans, and a dark hooded sweatshirt.

- The robber had a gun, which he pointed at K.K.'s face, scaring her.

- The robber jumped over the teller counter and said, "Give me the money, bitch."

- At some point, the robber pointed the gun at M.O.

- The gun was a small, silver semiautomatic pistol.

25

- The robber's mask looked homemade with eye holes and "maybe a mouth hole" cut out.

- The robber then opened K.K.'s teller drawer, removed money, checked the other teller drawers, and left the bank.

The prosecutor then asked, "Would it refresh your recollection to view your report whether [K.K.] described eye holes and a mouth hole or only eye holes?"  Without objection from defense counsel, the officer reviewed his report and the following exchange occurred:

> Q[.:] [D]oes that refresh your recollection as to what she described as a homemade looking mask?
>
> A[.:] Yes.
>
> Q[.:] What did she say about that?
>
> A[.:] Just that it had holes cut into it.

The officer next testified that he had asked K.K. to prepare a written statement.  After the officer reviewed K.K.'s statement — without objection from defense counsel — the following exchange occurred:

> Q[,:] [D]oes that refresh your recollection as to the description [K.K.] provided of the homemade-looking mask?
>
> A[.:] It does.
>
> Q[.:] And what did she indicate about the holes?

26

A[.:] Just eye holes were cut out.

The officer then stated that K.K. said that the robber wore gloves and she was unable to indicate the robber's skin color.

### B.    Preservation and Standard of Review

¶ 44    The parties agree that Townsell preserved his hearsay objection to K.K.'s oral statements to police.  But, we conclude, and he has conceded, that Townsell failed to preserve his hearsay objection to K.K.'s written statement.  *See People v. Bondsteel*, 2015 COA 165, ¶ 61 n.6 ("An appellant's failure to respond in the reply brief to an argument made in the answer brief may be taken as a concession.") (*cert. granted* Oct. 31, 2016).  The parties also agree that Townsell failed to preserve his argument that admitting the challenged evidence violated his confrontation rights.

¶ 45    We review a trial court's evidentiary rulings for an abuse of discretion.  *Relaford*, ¶ 25.  An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law.  *Id.*  Concerning a defendant's right to confrontation, whether a statement is testimonial is a question of law subject to de novo review.  *People v. Warrick*, 284 P.3d 139, 144 (Colo. App. 2011).

¶ 46   Where Townsell's arguments are preserved, we review for harmless error.  *See Yusem v. People*, 210 P.3d 458, 469 (Colo. 2009).  Under this standard, any erroneous admission requires reversal unless the error was harmless, that is, unless there is no "reasonable probability that it contributed to a defendant's conviction by substantially influencing the verdict or impairing the fairness of the trial."  *People v. Casias*, 2012 COA 117, ¶ 61.

¶ 47   Where Townsell's arguments are not preserved, we review for plain error.  *See Acosta*, ¶ 77.  Plain error is obvious and substantial.  *Hagos*, ¶ 14.  Reversal is required under this standard only if the error "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction."  *Id.* (citation omitted).

## C.   Law

¶ 48   Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  CRE 801(c).  If an out-of-court statement is not offered for its truth, it is admissible as nonhearsay evidence if it is relevant.  *See* CRE 402; *see also People v. Welsh*, 176 P.3d 781, 790 (Colo. App. 2007).  If a statement is hearsay, it is

28

inadmissible unless it (1) falls within an exception to the hearsay rule and (2) does not offend a defendant's constitutional right to confrontation.  CRE 802; *Nicholls v. People*, 2017 CO 71, ¶ 16.

¶ 49    The hearsay exception relevant here, found in CRE 803(2), states that the hearsay prohibition does not exclude excited utterances.  Excited utterances are "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  CRE 803(2). Admission under CRE 803(2) requires that "(1) the occurrence or event was sufficiently startling to render inoperative the normal reflective thought processes of an observer; (2) the declarant's statement was a spontaneous reaction to the event; and (3) direct or circumstantial evidence supports an inference that the declarant had the opportunity to observe the startling event."  *People v. Hagos*, 250 P.3d 596, 622 (Colo. App. 2009); *see also People v. Martinez*, 83 P.3d 1174, 1177 (Colo. App. 2003) (noting that the "trial court is in the best position to consider the effect of the startling event on the declarant" and has "wide discretion" in determining admissibility under CRE 803(2)).

¶ 50    A defendant has the right to confront and cross-examine witnesses. U.S. Const. amend. VI; Colo. Const. art. II, § 16. The right to confrontation "is principally concerned with 'testimonial' statements, i.e., statements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Nicholls*, ¶ 22; *see also Crawford v. Washington*, 541 U.S. 36, 52 (2004). Therefore, the Confrontation Clauses bar "admission of testimonial hearsay of a witness unless the declarant is unavailable at trial and the defendant had a prior opportunity to cross-examine [her]." *Nicholls*, ¶ 22; *People v. Fry*, 92 P.3d 970, 981 (Colo. 2004). Nontestimonial statements do not implicate a defendant's right to confrontation. *Davis v. Washington*, 547 U.S. 813, 822 (2006); *Nicholls*, ¶ 30.

¶ 51    "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 831-32 (noting that initial police inquiries involving situations like domestic disputes — in which the inquiries allow police to "assess the situation, the threat to their own safety, and possible danger to

30

the potential victim" — "*often*" produce nontestimonial statements).

Statements may be nontestimonial where their primary purpose is

to "catch a dangerous [suspect]" who "is still at large[.]"  *Williams*

*v. Illinois*, 567 U.S. 50, 84 (2012).

## D.    Analysis

¶ 52    We first determine that the trial court did not abuse its

discretion in allowing K.K.'s initial statements (via the officer's

testimony) as excited utterances.  *See* CRE 803(2); *Relaford*, ¶ 25.

The record indicates K.K. made the statements at issue while visibly

upset and shortly after she was robbed at gunpoint, and it is

undisputed that K.K. had an opportunity to observe the robbery.

Accordingly, we agree with the trial court that those statements are

excited utterances and, therefore, not barred by the hearsay rule.

*See Hagos*, 250 P.3d at 622; *Martinez*, 83 P.3d at 1177.

¶ 53    Next, we address K.K.'s three statements given by the officer

after he reviewed K.K.'s written statement without objection: (1) the

robber's mask had only eye holes cut out; (2) the robber wore

gloves; and (3) K.K. was unable to identify the robber's skin color.

The first and second statements were cumulative of other properly

admitted evidence — namely, corroborating eyewitness accounts,

31

the bank's surveillance video of the robbery, and the gloves and mask found in or near E.R.'s car.  And, the third statement — that K.K. was unable to identify the robber's skin color — did not substantially aid or hinder either party.  *See People v. Joyce*, 68 P.3d 521, 524 (Colo. App. 2002) (concluding that the trial court did not plainly err in allowing hearsay statements where the statements were cumulative of other properly admitted evidence and had "little impact on the verdict").  Given this analysis and the strong evidence of Townsell's guilt noted above, we conclude that any error in allowing the challenged evidence was not plain because it did not "so undermin[e] the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 14 (citation omitted).

¶ 54     Turning to Townsell's confrontation claim, the record indicates that K.K. made the challenged statements to police shortly after the robbery while police were actively pursuing, but had not yet identified or detained, a robber reportedly armed with a semiautomatic pistol.  K.K.'s description of the robber and his actions, therefore, assisted the police in identifying the robber, assessing the danger the robber at large posed to the public, and

32

detaining the fleeing robber. *See Davis*, 547 U.S. at 831; *see also Williams*, 567 U.S. at 83 ("[A] person who makes a statement to resolve an ongoing emergency is not acting like a trial witness because the declarant's purpose is not to provide a solemn declaration for use at trial, but to bring an end to an ongoing threat."). The testimonial nature of the challenged statements here is objectively doubtful and, given the lack of a contemporaneous objection, we cannot say that any error in allowing the statements was sufficiently obvious to constitute plain error. *See Hagos*, ¶ 14.

### VI. Insufficient Evidence: Felony Menacing and Aggravated Robbery Concerning M.O.

¶ 55    Townsell contends that there is insufficient evidence to support his menacing conviction concerning M.O. because there is no evidence that Townsell knew of M.O.'s presence in the bank. Townsell also asserts that there is insufficient evidence to support his aggravated robbery conviction concerning M.O. because there is no evidence that (1) Townsell knew of M.O.'s presence or (2) M.O. had any right to control the money in K.K.'s teller drawer. We are not persuaded.

33

A.    Preservation and Standard of Review

¶ 56    We may consider a sufficiency of the evidence claim regardless

of whether it is raised for the first time on appeal.  *See People*

*v. Duncan,* 109 P.3d 1044, 1045 (Colo. App. 2004); *see also People*

*v. McCoy,* 2015 COA 76M, ¶ 6 (*cert. granted in part* Oct. 3, 2016).[2]

We review the record de novo to determine whether the evidence at

trial was sufficient "both in quantity and quality to sustain the

defendant's conviction."  *Clark v. People,* 232 P.3d 1287, 1291

(Colo. 2010).

B.    Applicable Law

¶ 57    We are guided by the following principles when reviewing the

sufficiency of the evidence:

- The Due Process Clauses of the United States and Colorado

  Constitutions require proof of guilt beyond a reasonable

  doubt on each essential element of a crime.  *People*

  *v. Noland,* 739 P.2d 906 (Colo. App. 1987).  Accordingly, we

---

[2] Divisions of this court are divided as to whether to apply plain
error analysis in certain cases to claims of error alleging
insufficiency of the evidence.  *Compare People v. Lacallo,* 2014 COA
78, ¶¶ 2, 5-27 (applying plain error analysis), *with People v. McCoy,*
2015 COA 76M, ¶ 6 (rejecting plain error analysis) (*cert. granted in
part* Oct. 3, 2016).

34

must determine "whether the evidence, both direct and circumstantial, when viewed as a whole and in a light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable fact finder that the defendant is guilty of the crime charged beyond a reasonable doubt." *Duncan,* 109 P.3d at 1045.

- We afford the same status to direct and circumstantial evidence. *People v. Bennett,* 183 Colo. 125, 131, 515 P.2d 466, 469 (1973).

- We give the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence. *People v. Vecellio,* 2012 COA 40, ¶ 12. "It does not matter that, were we the trier of fact, we might have reached a different conclusion." *Clark,* 232 P.3d at 1291.

- "[V]erdicts in criminal cases may not be based on guessing, speculation, or conjecture." *People v. Stark,* 691 P.2d 334, 339 (Colo. 1984).

¶ 58    A person commits the crime of menacing if, "by any threat or physical action, he . . . knowingly places or attempts to place another person in fear of imminent serious bodily injury . . . [b]y the

35

use of a deadly weapon . . . ." § 18-3-206(1)(a), C.R.S. 2017.  A

person acts knowingly with respect to an element of an offense

when the person is aware that his conduct is of such a nature or

that such circumstances exist, or when he is aware that his

conduct is practically certain to cause the result.  *People*

*v. Heywood*, 2014 COA 99, ¶ 18; *People v. Johnson*, 923 P.2d 342,

346 (Colo. App. 1996).

¶ 59    "A person who knowingly takes anything of value from the

person or presence of another by the use of force, threats, or

intimidation commits robbery." § 18-4-301(1), C.R.S. 2017.  A

person commits aggravated robbery if, "during the act of robbery or

immediate flight therefrom," he, "by the use of force, threats, or

intimidation with a deadly weapon[,] knowingly puts the person

robbed or any other person in reasonable fear of death or bodily

injury." § 18-4-302(1)(b), C.R.S. 2017.

¶ 60    "Property is taken from the 'presence of another' . . . 'when it is

so within the victim's reach, inspection or observation that he . . .

would be able to retain control over the property but for the force,

threats, or intimidation directed by the perpetrator against the

victim.'" *People v. Williams*, 2012 COA 165, ¶ 38 (citation omitted);

*see also People v. Bartowsheski*, 661 P.2d 235, 244 (Colo. 1983) ("[T]he 'presence' element is broad enough to encompass the situation where the victim of the robbery, against whom the . . . threats . . . [are] directed, is present in one room of a family home and the taking occurs within another room.").

## C.    Analysis

¶ 61    Giving the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence, we conclude that there is sufficient evidence in the record to allow reasonable jurors to find that Townsell knew of M.O.'s presence in the bank lobby.  The following evidence was admitted at trial:

- The robber entered the bank through large glass doors.

- The robber's mask had eye holes cut out.

- M.O. heard the robber yell "nobody fucking move," which M.O. understood as being directed at himself and K.K. M.O. obeyed and remained seated until the robber left.

- The robber twice ran past M.O., who was wearing a bright yellow shirt and seated in a three-sided cubicle with the opening facing the teller counter.  M.O.'s cubicle walls were partially opaque and partially glass.  M.O. was about ten

37

feet from the door where the robber entered and exited the bank.

- K.K. saw the robber point the gun at M.O.  M.O. testified that the robber pointed the gun "in [his] direction."

- The bank lobby was small enough for the robber to run from one end to the other, take money from K.K.'s teller drawer, and return to the door on the other side of the lobby in twenty-eight seconds.

The record thus contains substantial evidence from which a reasonable jury could infer that Townsell knew that M.O. was present and pointed a gun at him during the robbery, thereby "knowingly plac[ing] or attempt[ing] to place [M.O.] in fear of imminent serious bodily injury . . . [b]y the use of a deadly weapon[.]"  § 18-3-206(1)(a).  A reasonable jury could also infer from the evidence that Townsell had the requisite mental state to "knowingly" rob M.O.  *See* § 18-4-301(1); *see also Heywood*, ¶ 18; *Johnson*, 923 P.2d at 346.

¶ 62    We also conclude that the evidence was sufficient to allow reasonable jurors to find that Townsell took something of value "from the person or presence of" M.O. because M.O. could have

"retain[ed] control over the property but for the force, threats, or
intimidation directed by" Townsell against M.O.  *Williams*, ¶ 38.
The following evidence was admitted at trial:

- M.O. worked at the bank as a financial services consultant.

- Only three other bank employees were in the bank during
  the robbery — K.K. was in the lobby, and another bank
  teller and an administrative assistant were in another room.

- M.O. possessed the keys to the bank, which he used to lock
  the doors after the robber left.

- Immediately after the robber left the bank, M.O. proceeded
  to follow protocols, including locking the bank and calling
  the police.

¶ 63    A reasonable jury could thus infer that M.O. had some
supervisory duties as a bank employee and, consequently, had the
right to protect bank property (including the money in K.K.'s
drawer) from being taken illicitly.  *Compare Williams*, ¶ 44 (judging
the evidence sufficient to support a robbery conviction where the
victim, a co-owner of a tattoo shop where the robbery occurred, had
sufficient ownership or control over the money in another
co-owner's pockets), *and Anderson-Bey v. Zavaras*, 641 F.3d 445,

39

452 (10th Cir. 2011) (noting that, under Colorado law, evidence was sufficient to support a robbery conviction where the victim was an employee with "general responsibilities with respect to property in the store" — including closing and securing the shop "at the end of the day" — although the victim had no specific duties concerning the cash register that was robbed), *with People v. Ridenour*, 878 P.2d 23, 27 (Colo. App. 1994) (concluding that the evidence was not sufficient to support a robbery conviction where the alleged victim was a ticket taker at a movie theater and had no (1) physical possession of the stolen money; (2) duties to handle payments or cash; or (3) right to control money stolen from the theater's safe).

¶ 64    The evidence in the record, when viewed in the light most favorable to the prosecution, was sufficient to support the menacing and aggravated robbery convictions concerning M.O. *See Duncan,* 109 P.3d at 1045.

## VII.   Cumulative Error

¶ 65    Townsell argues that the asserted errors, when analyzed in the aggregate, require reversal because they undermined the fundamental fairness of the proceedings.  We have identified no errors, let alone any errors warranting reversal.  Thus, we conclude

that no errors cumulatively operated to deprive Townsell of a fair trial. *See People v. Carter*, 2015 COA 24M-2, ¶ 80 ("[T]he doctrine of cumulative error requires that numerous errors be committed, not merely alleged [and] a conviction will not be reversed if the cumulative effect of any errors did not substantially prejudice the defendant's right to a fair trial.") (citations omitted).

### VIII. Consecutive Sentences For Aggravated Robbery

¶ 66 Lastly, Townsell asserts that the trial court erroneously entered consecutive sentences for the aggravated robbery convictions because the convictions are based on identical evidence and the trial court mistakenly believed that consecutive sentences were mandatory. We disagree.

### A. Preservation and Standard of Review

¶ 67 The parties agree that this issue was properly preserved.

¶ 68 We review a trial court's sentencing decision for an abuse of discretion. *People v. Espinoza*, 2017 COA 122, ¶ 21. An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law. *Relaford*, ¶ 25. We review a trial court's application of sentencing statutes de novo. *Espinoza*, ¶ 21.

41

¶ 69    In construing legislation, we look first to the plain language of the statute, reading it as a whole.  *Young v. Brighton Sch. Dist. 27J*, 2014 CO 32, ¶ 11.  Then, if the language is ambiguous, or if the statute appears to conflict with other provisions, we "construe the statute in light of the General Assembly's objective," presuming "that the legislature intended" the statutory scheme to have "a consistent, harmonious, and sensible effect."  *Anderson v. Vail Corp.*, 251 P.3d 1125, 1127-28 (Colo. App. 2010); *see also Espinoza*, ¶ 23.  "If the conflict is irreconcilable, however, a 'special or local provision prevails as an exception to [a] general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail.'"  *Espinoza*, ¶ 24 (citation omitted).

¶ 70    "When a court 'imposes consecutive sentences under the mistaken belief that it has no discretion to impose concurrent sentences,' '[a] remand for resentencing is appropriate.'"  *Id.* at ¶ 25 (quoting *People v. O'Connell*, 134 P.3d 460, 466 (Colo. App. 2005)).

### B.    Law and Analysis

¶ 71    The robbery at issue occurred on June 15, 2013.  *See People v. Wolfe*, 213 P.3d 1035, 1036 (Colo. App. 2009) ("[T]he statutory

42

authority to impose a sentence is determined by the sentencing scheme in effect on the date of the offense.").  The operative version of section 18-1.3-406(1)(a), C.R.S. 2012, states, "A person convicted of two or more separate crimes of violence arising out of the same incident *shall* be sentenced for such crimes so that sentences are served consecutively rather than concurrently."  (Emphasis added.)  The statute also specifies that subsection 406(1)(a) "applies to . . . [a]ggravated robbery[.]"  § 18-1.3-406(2)(a)(II)(F).

¶ 72    A related sentencing statute provides

> If more than one guilty verdict is returned as to any defendant in a prosecution where multiple counts are tried . . ., the sentences imposed shall run concurrently; except that, where multiple victims are involved, the court may, within its discretion, impose consecutive sentences.

§ 18-1-408(3), C.R.S. 2017.  Section 18-1-408(3) "mandates imposition of concurrent sentences for offenses committed against a *single victim* when the counts are based on the same act or series of acts arising from the same criminal episode and the evidence supporting the counts is identical."  *People v. Jurado*, 30 P.3d 769, 772-73 (Colo. App. 2001) (emphasis added); *see also Schneider v. People*, 2016 CO 70, ¶ 12 (noting that concurrent sentences are

43

mandatory under section 18-1-408(3) only for separate offenses —

"based on the same act or series of acts arising from the same

criminal episode" — that are supported by identical evidence "and

do not involve multiple victims") (citation omitted).

¶ 73    As relevant here, section 18-1-408(3) mandates concurrent

sentences when only one victim is involved.  The record shows that

the bank robbery involved at least two victims — K.K. and M.O.

Accordingly, section 18-1-408(3)'s concurrent sentence requirement

is inapplicable here.  *See Schneider*, ¶ 12; *Jurado*, 30 P.3d at

772-73.

¶ 74    Regardless, to the extent that the two statutes seem to

conflict, section 18-1.3-406(1)(a)'s pertinent provisions — which are

more specific to the crime of aggravated robbery and other crimes of

violence — prevail over section 18-1-408(3)'s more general terms.

*See Espinoza*, ¶ 24.  The plain language of sections 18-1.3-406(1)(a)

and -406(2)(a)(II)(F), C.R.S. 2012, indicates that consecutive

sentences are mandatory in cases such as this, where a person has

been "convicted of two or more separate crimes of violence arising

out of the same incident."  Accordingly, we conclude that the trial

court did not err in interpreting the applicable sentencing statutes

44

or in imposing consecutive sentences for Townsell's aggravated robbery convictions.  *See Espinoza*, ¶ 21.

## IX.    Conclusion

¶ 75    The judgment and sentences are affirmed.

JUDGE FURMAN and JUDGE ASHBY concur.

45

# Court of Appeals

**STATE OF COLORADO**
**2 East 14th Avenue**
**Denver, CO 80203**
**(720) 625-5150**

**PAULINE BROCK**
**CLERK OF THE COURT**

## NOTICE CONCERNING ISSUANCE OF THE MANDATE

Pursuant to C.A.R. 41(b), the mandate of the Court of Appeals may issue forty-three days after entry of the judgment.  In worker's compensation and unemployment insurance cases, the mandate of the Court of Appeals may issue thirty-one days after entry of the judgment.  Pursuant to C.A.R. 3.4(m), the mandate of the Court of Appeals may issue twenty-nine days after the entry of the judgment in appeals from proceedings in dependency or neglect.

Filing of a Petition for Rehearing, within the time permitted by C.A.R. 40, will stay the mandate until the court has ruled on the petition.  Filing a Petition for Writ of Certiorari with the Supreme Court, within the time permitted by C.A.R. 52(b), will also stay the mandate until the Supreme Court has ruled on the Petition.

BY THE COURT:          Alan M. Loeb
                       Chief Judge

DATED:  October 19, 2017

> ***Notice to self-represented parties***:  *The Colorado Bar Association provides free volunteer attorneys in a small number of appellate cases.  If you are representing yourself and meet the CBA low income qualifications, you may apply to the CBA to see if your case may be chosen for a free lawyer.  Self-represented parties who are interested should visit the Appellate Pro Bono Program page at http://www.cba.cobar.org/repository/Access%20to%20Justice/AppelateProBono/CBAAppProBonoProg_PublicInfoApp.pdf*



ATTACHMENT
B

| Colorado Court of Appeals<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: May 10, 2018<br>CASE NUMBER: 2014CA1225 |
|---|---|
| Arapahoe County<br>2013CR2039 | |
| **Plaintiff-Appellee:**<br><br>The People of the State of Colorado,<br><br>**v.**<br><br>**Defendant-Appellant:**<br><br>Jamale D Townsell. | Court of Appeals Case<br>Number:<br>2014CA1225 |
| ORDER DENYING PETITION FOR REHEARING | |

The **PETITION FOR REHEARING** filed in this appeal by:
Jamale D. Townsell, Defendant-Appellant

is **DENIED**.

Issuance of the Mandate is stayed until: June 8, 2018.

If a Petition for Certiorari is timely filed with the Supreme Court of Colorado, the stay shall remain in effect until disposition of the cause by that Court.

BY THE COURT
Furman, J.
Fox, J.
Ashby, J.