| | |
|---|---|
| SUPREME COURT, STATE OF COLORADO, 2 East 14th Ave., Denver, CO 80203 | DATE FILED December 16, 2024 6:14 PM FILING ID: A5F9080180949 CASE NUMBER: 2023SC924 |
| Colorado Court of Appeals Case Number 2021CA2068; Division III; Opinion by Judge Johnson; J. Jones, J., concurs; Schutz, J., dissents<br><br>Arapahoe County District Court; Honorable Shay K. Whitaker; Case Number 13CR2039 | |
| **Petitioner**: JAMALE D. TOWNSELL,<br><br>v.<br><br>**Respondent**: THE PEOPLE OF THE STATE OF COLORADO. | Case No. 2023SC924 |
| *Attorneys for Amicus Curiae, The Korey Wise Innocence Project*:<br>Clarissa M. Collier (#40374 )<br>Nicole L. Jones (#51382)<br>Wheeler Trigg O'Donnell LLP<br>370 17th Street, Suite 4500<br>Denver, CO 80202<br>Telephone: 303.244.1800<br>Email:        collier@wtotrial.com<br>              njones@wtotrial.com | |
| **BRIEF OF *AMICUS CURIAE* KOREY WISE INNOCENCE PROJECT IN SUPPORT OF PETITIONER JAMALE D. TOWNSELL** | |

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this amicus brief complies with C.A.R. 28, 29, and 32, including all formatting requirements set forth in these rules. Specifically, the undersigned certifies that the amicus brief complies with the applicable word limits set forth in C.A.R. 28(g) and 29(d). It contains **4,750** words.

The amicus brief complies with the content and form requirements set forth in C.A.R. 29(c).

The undersigned acknowledges that the brief may be stricken if it fails to comply with any of the requirements of C.A.R. 28, 29, and 32.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

AMICUS CURIAE'S STATEMENT OF INTEREST ............................................. 1

INTRODUCTION ................................................................................................. 2

I.     INEFFECTIVE ASSISTANCE OF COUNSEL AND FAULTY OR
       MISLEADING FORENSIC EVIDENCE CAUSE WRONGFUL
       CONVICTIONS ......................................................................................... 6

II.    DNA EVIDENCE PLAYS A CRUCIAL ROLE IN EXONERATING
       THE WRONGFULLY CONVICTED YET PRESENTS UNIQUE
       CHALLENGES TO INDIGENT INCARCERATED PETITIONERS .......... 9

       A.     DNA Evidence Is Critical to Freeing Innocent Incarcerated
              Individuals ..................................................................................... 9

              1.     Exclusion ............................................................................. 10

              2.     Inclusion ............................................................................. 11

                     a.     Lorenzo Montoya ...................................................... 12

                     b.     Robert Dewey ........................................................... 13

              3.     Redundancy ......................................................................... 15

       B.     Indigent Incarcerated Individuals Face Numerous Barriers in
              Unleashing the Power of DNA Evidence Postconviction ................ 18

CONCLUSION ................................................................................................... 23

# TABLE OF AUTHORITIES

**CASES**

*Ardolino v. People*,
   69 P.3d 73 (Colo. 2003) ................................................................................ 9, 17

*Davis v. Huphreys*,
   747 F.3d 497 (7th Cir. 2014) ................................................................................. 4

*Dist. Att'ys Off. for Third Jud. Dist. v. Osborne*,
   557 U.S. 52 (2009) ........................................................................................ 4, 18

*Herrera v. Collins*,
   506 U.S. 390 (1993) ............................................................................................. 2

*Hutchinson v. People*,
   742 P.2d 875 (Colo. 1987) ................................................................................... 4

*Jones v. Hendrix*,
   599 U.S. 465 (2023) ............................................................................................. 3

*Martinez v. Ryan*,
   566 U.S. 1 (2012) ................................................................................................. 5

*Massaro v. United States*,
   538 U.S. 500 (2003) ............................................................................................. 5

*McMann v. Richardson*,
   397 U.S. 759 (1970) ............................................................................................. 4

*People v. Lopez*,
   2015 COA 45 ........................................................................................................ 5

*People v. Marks*,
   2015 COA 173 .................................................................................................... 10

*People v. Montoya*,
   No. 00CA2236 (Colo. App. Feb. 26, 2004) (unpublished pursuant to C.A.R.
   35(f)) (available at https://research.coloradojudicial.gov/en/vid/1042628814) ... 13

*People v. Segura*,
2024 CO 70.................................................................................................17

*People v. Thames*,
2015 CO 18.................................................................................................13

*People v. Thames*,
2019 COA 124.................................................................................... 13, 14

*People v. Townsell*,
No. 21CA2068 (Colo. App. Nov. 16, 2023) (unpublished pursuant to C.A.R.
35(f))........................................................................................... *passim*

*Powell v. Alabama*,
287 U.S. 45 (1932) .......................................................................................5

*Silva v. People*,
156 P.3d 1164 (Colo. 2007) ......................................................................17

*Strickland v. Washington*,
466 U.S. 668 (1984) .....................................................................................3

*Stuart v. Alabama*,
139 S. Ct. 36 (2018) ..................................................................................20

*United States v. Cronic*,
466 U.S. 648 (1984) .....................................................................................2

## STATUTES

C.R.S. § 16-23-102 ...................................................................................12

## RULES

C.A.R. 35.................................................................................................2, 13

Colo. R. Crim. P. 35.......................................................................... *passim*

iv

## OTHER AUTHORITIES

A.B.A. Standing Comm. on Legal Aid & Indigent Defs., Gideon's *Broken
Promise: America's Continuing Quest for Equal Justice* (2004) .........................9

Barry Schreck et al., *Actual Innocence* (1999) .........................................................6

Brandon L. Garrett & Peter J. Neufeld, *Invalid Forensic Science Testimony and
Wrongful Convictions*,
95 Va. L. Rev. 1 (2009)..............................................................................................7

Brandon L. Garrett, *Claiming Innocence*,
92 Minn. L. Rev. 1629 (2008)............................................................................. 8, 10

Brandon L. Garrett, *DNA and Due Process*,
78 Fordham L. Rev. 2929 (2010) ........................................................................12

Colo. Bureau of Investigations, *Yvonne "Missy" Woods Investigation*,
https://cbi.colorado.gov/sections/administration/media-relations/yvonne-missy-
woods-investigation.....................................................................................................8

*Clarence Moses-El*, The Nat'l Registry of Exonerations,
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5
034 ................................................................................................................................8

Colo. Just. Rev. Project, *Final Report* (2012) ........................................................14

D. Frosh & Z. Elinson, *The DNA Scandal That Could Threaten Thousands of
Cases*, Wall St. J. (Mar. 7, 2024),
https://www.wsj.com/us-news/dna-evidence-scandal-colorado-missy-woods-
5b20df6c ......................................................................................................................8

Erin Murphy, *The Art in the Science of DNA: A Layperson's Guide to the
Subjectivity Inherent in Forensic DNA Typing*,
58 Emory L. J. 489 (2008)................................................................................. 10, 20

Erin Murphy, *The New Forensics: Criminal Justice, False Certainty, and the
Second Generation of Scientific Evidence*,
95 Calif. L. Rev. 721 (2007).................................................................................20

Fed. Bureau of Investigations, *Frequently Asked Questions on CODIS and NDIS*,
https://www.fbi.gov/how-we-can-help-you/dna-fingerprint-act-of-2005-
expungement-policy/codis-and-ndis-fact-sheet ....................................................11

James S. Liebman et al., *Capital Attrition Error Rates in Capital Cases,
1973-1995*,
78 Tex. L. Rev. 1839 (2000) ................................................................................8

Jason Borenstein, *DNA in the Legal System: The Benefits Are Clear,
The Problems Aren't Always*,
3 Cardozo Pub. L., Pol'y & Ethics J. 847 (2015)........................................ 19, 20

Jessica Fender, *Exonerated: DNA Clears Robert Dewey of a 1996 Conviction
for a Murder He Didn't Commit*,
2012 WLNR 30118142, Denv. Post (May 1, 2012) ...........................................14

Joint Budget Comm., Supplemental Budget Requests FY 2023-24, Dep't Pub.
Safety (Jan. 16, 2024),
https://leg.colorado.gov/sites/default/files/cy24_pubsafsup.pdf...........................8

Jon B. Gould & Richard A. Leo, *One Hundred Years Later:
Wrongful Convictions After a Century of Research*,
100 J. Crim. L. & Criminology 825 (2010) ..........................................................6

Joseph Heller, *Catch-22, A Novel* (New York: The Modern Library 1961) .............3

Justin Brooks & Alexander Simpson, *Blood Sugar Sex Magik: A Review of
Postconviction DNA Testing Statutes and Legislative Recommendations*,
59 Drake L. Rev. 799 (2011)...............................................................................19

*Larry Peterson*, The Nat'l Registry of Exonerations,
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3
532 ......................................................................................................................16

*Lorenzo Montoya*, The Nat'l Registry of Exonerations,
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4
446 ......................................................................................................................12

Michael L. Radelet et al., *In Spite of Innocence: Erroneous
Convictions in Capital Cases* (1992)....................................................................6

*Joseph White*, The Nat'l Registry of Exonerations,
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3
736 .................................................................................................................21

*Paul House*, The Nat'l Registry of Exonerations,
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3
307 .................................................................................................................21

*Robert Dewey*, The Nat'l Registry of Exonerations,
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3
910 .................................................................................................................13

Rosa Ellis Greenbaum, Thesis, *Investigating Innocence: Comprehensive
Pre-trial Defense Investigation to Prevent Wrongful Convictions*,
U.C. Irvine (2019), https://escholarship.org/uc/item/3hk3s9wx ...........................6

*Search Exonerations*, The Nat'l Registry of Exonerations,
https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx .............6, 7

Seth F. Kreimer & David Rudovsky, *Double Helix, Double Bind: Factual
Innocence and Postconviction DNA Testing*,
151 Univ. Pa. L. Rev. 547 (2002) ..........................................................................3

*Timothy Masters*, The Nat'l Registry of Exonerations,
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3
412 .................................................................................................................22

U.S. Dep't of Just., Nat'l Inst. of Just., Special Report,
*Wrongful Convictions: The Literature, The Issues, and
The Unheard Voices* (Dec. 2023) ...........................................................................7

U.S. Dep't of Just., Nat'l Inst. Just., DNA Initiative,
*DNA for the Defense Bar* 8 (June 2012)........................................... 7, 17, 19, 21

U.S. Dep't of Just., Nat'l Inst. Just., Nat'l Comm'n on the Future of DNA
Evidence, *Postconviction DNA Testing: Recommendations for Handling
Requests* (Sept. 1999) ..........................................................................................10

## **AMICUS CURIAE'S STATEMENT OF INTEREST**

The Korey Wise Innocence Project ("KWIP") is a nonprofit legal organization that provides pro bono legal and investigative services to people serving time in Colorado prisons for crimes they did not commit. KWIP is dedicated to improving the reliability of the criminal justice system, and advocates for reforms to prevent and correct wrongful convictions. KWIP seeks to ensure that criminal defendants have access to DNA testing, a meaningful opportunity to develop meritorious ineffective assistance of counsel ("IAC") claims, and the ability to prove their actual innocence in postconviction proceedings. Because flawed forensic science has contributed to scores of wrongful convictions nationwide, KWIP has prioritized identifying cases where Coloradans have been convicted based on discredited or misleading forensic evidence.

KWIP has a vested interest in the outcome of this matter and, in particular, the pleading standard for indigent pro se petitioners asserting IAC claims for failure to investigate DNA evidence. This issue is of great importance to the integrity of our criminal justice system and is consequential to the wrongfully convicted that KWIP works to free from injustice. KWIP takes great interest in protecting criminal defendants' right to effective assistance of counsel, which is integral to the right to a fair trial and the prevention of wrongful convictions. KWIP therefore submits this

1

brief in support of Petitioner to provide insight regarding Issue Number 2 and urges

this Court to reverse the division's opinion in *People v. Townsell*, No. 21CA2068

(Colo. App. Nov. 16, 2023) (unpublished pursuant to C.A.R. 35(f)).

## **INTRODUCTION**

Our criminal justice system is founded on a longstanding commitment to

protecting innocent people's liberty and punishing only those who are truly culpable.

*See Herrera v. Collins*, 506 U.S. 390, 398 (1993) ("[T]he central purpose of any

system of criminal justice" is not just "to convict the guilty," but also to "free the

innocent."). The right to postconviction counsel afforded to indigent pro se

petitioners through Crim P. 35(c) reflects those principles. But Rule 35(c) can

support the principles of fairness and accuracy only if it is interpreted in a way that

promotes access to justice and protects petitioners' constitutional right to effective

assistance of counsel. *See United States v. Cronic*, 466 U.S. 648, 654 (1984)

(recognizing such right as "by far the most pervasive" of "all the rights that an

accused person has").

Under the *Townsell* majority's interpretation of Rule 35(c), however, indigent

pro se petitioners with arguably meritorious IAC claims for failure to investigate

DNA evidence are faced with an "insurmountable burden" in obtaining

postconviction counsel and, in turn, pursuing such claims. *Townsell*, 21CA2068,

¶¶ 40-41 (Schutz, J., dissenting) ("The net effect of [the majority's] reasoning is to deprive a defendant of an evidentiary hearing because of the failure to present the evidence he claims trial counsel failed to procure in the first instance.").

The devastating effect of this tortured interpretation places indigent pro se petitioners, like Townsell, in an untenable Catch-22.[1] To be appointed postconviction counsel on an IAC claim for failure to investigate DNA evidence, petitioners must specify how ***untested*** DNA evidence would undermine confidence in the conviction, requiring ***indigent pro se*** petitioners to first obtain DNA testing results ***while incarcerated***.[2] This "mechanical rule" undermines the Sixth Amendment right to counsel. *Strickland v. Washington*, 466 U.S. 668, 696 (1984) ("Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules."). Townsell, and other indigent pro se petitioners like him, are

---

[1] Joseph Heller, *Catch-22, A Novel* (New York: The Modern Library 1961).

[2] Other courts have recognized similar untenable circumstances at the postconviction stage. *See, e.g.*, *Jones v. Hendrix*, 599 U.S. 465, 517 (2023) (Jackson, J., dissenting); *see also* Seth F. Kreimer & David Rudovsky, *Double Helix, Double Bind: Factual Innocence and Postconviction DNA Testing*, 151 Univ. Pa. L. Rev. 547, 564 (2002) ("[I]t is not uncommon for convicted individuals to find themselves in a 'Catch-22,' where the only road to a showing of innocence leads through DNA evidence in the possession of the prosecutor, and the prosecutor refuses to allow access to the evidence in the absence of proof of innocence.").

therefore stuck in a paradox. Without this Court's intervention,[3] it will be virtually impossible for them to find a way out.

## **ARGUMENT**

"DNA [evidence] has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty." *Dist. Att'ys Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 55 (2009). When trial counsel fails to adequately investigate this uniquely influential evidence, a criminal defendant's life and liberty are placed in jeopardy. *See Hutchinson v. People*, 742 P.2d 875, 880 (Colo. 1987) (recognizing the right to effective assistance of counsel "is a fundamental component of our criminal justice system" (citation omitted)); *see also McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) ("It has been long recognized that the right to counsel is the right to the effective assistance of counsel.").

Where trial counsel performed deficiently by failing to investigate DNA evidence, an indigent pro se petitioner should not be required to establish prejudice before postconviction counsel is appointed to represent them on a Rule 35(c) petition. If the petitioner's requested testing was not done in the first place,

---

[3] At least one circuit court has cautioned that the "judiciary should avoid using Catch-22" to preclude a criminal defendant relief. *See Davis v. Huphreys*, 747 F.3d 497, 498 (7th Cir. 2014).

establishing prejudice is impossible without the aid of counsel. *See Martinez v. Ryan*, 566 U.S. 1, 12 (2012) ("While confined to prison, the prisoner is in no position to develop the evidentiary basis for a claim of ineffective assistance, which often turns on evidence outside the trial record."). DNA testing results are unpredictable. *Cf. Massaro v. United States*, 538 U.S. 500, 506 (2003) (recognizing that expansion of the trial record through appointment of counsel and an evidentiary hearing is vital to establishing IAC claims). The Court should decline to hold indigent incarcerated petitioners to an unsustainable standard and allow learned counsel to step in, as contemplated by Rule 35(c). *See People v. Lopez*, 2015 COA 45, ¶ 71 ("Crim. P. 35(c) presumes that a postconviction court will hold hearings if the defendant raised allegations of [IAC].").

Without assistance of counsel, indigent pro se petitioners, like Townsell, will be foreclosed from establishing their innocence. *See Powell v. Alabama*, 287 U.S. 45, 68-69 (1932) (emphasizing the importance of effective assistance to innocent defendants: "Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence."). This Court should not tolerate this result.

Accordingly, the Court should reverse the division's decision, answer the issue that is the subject of this brief with a resounding no, and remand the case to the district court with instructions to appoint Townsell postconviction counsel.

## I.    INEFFECTIVE ASSISTANCE OF COUNSEL AND FAULTY OR MISLEADING FORENSIC EVIDENCE CAUSE WRONGFUL CONVICTIONS

Inadequate legal defense drives wrongful convictions of innocent people.[4] And while ineffective assistance takes numerous forms, failure to investigate forensic evidence predominates. Investigative failures are far more frequent than other forms of legal inadequacies, and false or misleading forensic evidence contributes to a startling share of wrongful convictions nationwide.[5] Numerous DNA exonerations bear that out.[6]

---

[4] *See, e.g.*, Jon B. Gould & Richard A. Leo, *One Hundred Years Later: Wrongful Convictions After a Century of Research*, 100 J. Crim. L. & Criminology 825, 855-56 (2010); Michael L. Radelet et al., *In Spite of Innocence: Erroneous Convictions in Capital Cases* (1992); Barry Schreck et al., *Actual Innocence* 263 (1999).

[5] Rosa Ellis Greenbaum, Thesis, *Investigating Innocence: Comprehensive Pre-trial Defense Investigation to Prevent Wrongful Convictions*, U.C. Irvine (2019), https://escholarship.org/uc/item/3hk3s9wx.

[6] *Search Exonerations*, The Nat'l Registry of Exonerations ("NRE"), https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx.

Over the last thirty-five years, 3,627 wrongfully convicted individuals have been exonerated.[7] In nearly forty-eight percent of these cases, an inadequate legal defense and/or false or misleading forensic evidence contributed to the wrongful conviction.[8] Further, postconviction DNA testing contributed to 608 of those exonerations as of the drafting of this brief.[9] DNA testing can prove innocence with far greater certainty than other forms of evidence—even long after the commission of a crime—and DNA profiles can be detected in minute amounts from numerous sources of biological material.[10]

With the wide use of DNA testing in criminal investigations and trials alike, evidence of innocence has never been more important.[11] The treatment of DNA during the investigative process and at trial is therefore crucial to preventing

---

[7] *Id.* "Research on the topic acknowledges that *known* wrongful convictions are likely only a fraction of the true number of erroneous convictions that have occurred." U.S. Dep't of Just., Nat'l Inst. of Just. ("NIJ"), Special Report, *Wrongful Convictions: The Literature, The Issues, and The Unheard Voices* (Dec. 2023).

[8] NRE, *supra*, note 6 (filtering exonerations for inadequate legal defense and false or misleading forensic evidence and calculating this percentage).

[9] *Id.* (filtering for DNA exonerations).

[10] *See* U.S. Dep't of Just., NIJ, DNA Initiative, *DNA for the Defense Bar* 8-11, 19 (June 2012) [hereinafter *DNA*].

[11] *See* Brandon L. Garrett & Peter J. Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions*, 95 Va. L. Rev. 1, 89-90 (2009).

wrongful convictions.[12] But numerous factors hinder criminal defendants' ability to obtain DNA testing during the trial stage including, among others, errors or misconduct by forensic experts,[13] ineffective lawyering, inadequate preservation of biological evidence, and the improper handling and disclosure of biological material and DNA test results.[14] Consequently, this Court must ensure our rules of criminal procedure allow defendants "full and accurate access to physical and forensic evidence probative of innocence,"[15] with the assistance of postconviction counsel, as well as the ability to pursue claims to right these wrongs.[16]

---

[12] *See* Brandon L. Garrett, *Claiming Innocence*, 92 Minn. L. Rev. 1629, 1652-56 (2008) ("[M]ore than one-fourth [of the first 211 exonerations]. . . were convicted even though DNA testing was available at the time of their trials.").

[13] Colorado is not immune. *See* CBI, *Yvonne "Missy" Woods Investigation*, https://cbi.colorado.gov/sections/administration/media-relations/yvonne-missy-woods-investigation; Joint Budget Comm., Supplemental Budget Requests FY 2023-24, Dep't Pub. Safety (Jan. 16, 2024), https://leg.colorado.gov/sites/default/files/cy24_pubsafsup.pdf; D. Frosh & Z. Elinson, *The DNA Scandal That Could Threaten Thousands of Cases*, Wall St. J. (Mar. 7, 2024), https://www.wsj.com/us-news/dna-evidence-scandal-colorado-missy-woods-5b20df6c (discussing Colorado's Missy Woods scandal).

[14] *See, e.g.*, *Clarence Moses-El*, NRE, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5034 (encompassing these three factors).

[15] Garrett, *supra* note 12, at 1634.

[16] James S. Liebman et al., *Capital Attrition Error Rates in Capital Cases, 1973-1995*, 78 Tex. L. Rev. 1839, 1850 (2000) (concluding that "egregiously incompetent defense lawyering" is one of the two "most common errors found at the state post-

Given the unique and powerful nature of DNA evidence to prove innocence at trial or to later exonerate the wrongfully convicted, indigent pro se petitioners should not be required to speculate on the intricacies of DNA evidence and how it might free them from injustice. *See Ardolino v. People*, 69 P.3d 73, 78 (Colo. 2003) ("The defendant [is] not obliged to credibly allege that his counsel's shortcomings caused the conviction, in the sense that without them the defendant probably would not have been convicted."). To hold otherwise would inhibit access to justice and erode criminal defendants' Sixth Amendment right to effective assistance of counsel. The Court should therefore apply Rule 35(c) according to its plain language—as explained in Petitioner's opening brief.

## II.     DNA EVIDENCE PLAYS A CRUCIAL ROLE IN EXONERATING THE WRONGFULLY CONVICTED YET PRESENTS UNIQUE CHALLENGES TO INDIGENT INCARCERATED PETITIONERS

### A.     DNA Evidence Is Critical to Freeing Innocent Incarcerated Individuals

DNA evidence is powerful. It can conclusively prove a suspect's innocence by excluding them as the source of biological material found at a crime scene. It can be used to match a known suspect or an unknown person to crime scene evidence,

---

conviction stage"); A.B.A. Standing Comm. on Legal Aid & Indigent Defs., Gideon's *Broken Promise: America's Continuing Quest for Equal Justice* 3 (2004) (recognizing that "inadequate representation often is cited as a significant contributing factor" to wrongful convictions).

9

thereby conclusively establishing not only the suspect's innocence, but also the true perpetrator's identity.[17] And, it can tell an entirely different story than what was presented at trial. As DNA "evidence has long enjoyed a status of 'mythic infallibility' for juries," *People v. Marks*, 2015 COA 173, ¶ 41 (citation omitted), it is oft misunderstood by both laypersons and experienced jurists alike. There are three principal ways that postconviction DNA testing can prove innocence.

### 1.    Exclusion

Perhaps the best-known type of exoneration based on DNA evidence is a simple exclusion—using DNA to exclude a defendant from a single item of highly probative evidence.[18] But, this approach is effective only in specific types of cases. Namely, for defendants convicted of sexual assault where semen that was found in, on, or near the victim could only have come from the perpetrator, exclusion alone is often enough.[19] Exclusion is unlikely to establish innocence in Townsell's case because his DNA (along with the DNA of at least one other person) was found on

---

[17] U.S. Dep't of Just., NIJ, Nat'l Comm'n on the Future of DNA Evidence, *Postconviction DNA Testing: Recommendations for Handling Requests* 21-22, 28 (Sept. 1999).

[18] Erin Murphy, *The Art in the Science of DNA: A Layperson's Guide to the Subjectivity Inherent in Forensic DNA Typing*, 58 Emory L. J. 489, 493 (2008).

[19] Garrett, *supra* note 12, at 1647.

the mask. However, as explained in his opening brief, Townsell has an innocent explanation for the presence of his profile.

> 2.     Inclusion

Another method of exoneration through DNA testing is known as inclusion, which results when a DNA profile other than the defendant's is located on items associated with the crime. This method can both exonerate the wrongly convicted and identify the real perpetrator. This dual result can be reached in two ways. First, a DNA profile developed from evidentiary items can be compared to the profile of a known alternate suspect who better fits the description of the perpetrator. Second, a DNA profile developed from evidentiary items can be matched with a person whose profile is contained in a state or federal DNA databank, including the Federal Bureau of Investigation's ("FBI") Combined DNA Index System ("CODIS").[20]

Not only have law enforcement agencies become adept at solving crimes through the use of DNA databanks, but innocent incarcerated individuals have also found salvation from wrongful convictions through DNA testing that identified the

---

[20] FBI, *Frequently Asked Questions on CODIS and NDIS*, https://www.fbi.gov/how-we-can-help-you/dna-fingerprint-act-of-2005-expungement-policy/codis-and-ndis-fact-sheet.

true perpetrator.[21] In fact, the law authorizing Colorado's databank, the "DNA Crime Prevention and Exoneration of the Innocent Act," was enacted to prevent crime *and* free the innocent. *See* § 16-23-102, C.R.S.

In Colorado, two salient examples illustrate the power of DNA evidence to exonerate a defendant and simultaneously identify the guilty, one by matching crime scene DNA to a known suspect and the other by matching crime scene DNA to a profile in CODIS.

### a.    *Lorenzo Montoya*[22]

Lorenzo Montoya was convicted of felony murder, first-degree robbery, burglary, and aggravated motor vehicle theft, and was sentenced to life without parole after making a false confession. Montoya was fourteen years old and had an IQ score of sixty-nine. After ninety minutes of interrogation, Montoya confessed to the brutal murder of a special-education teacher. In addition, Montoya's former cellmate testified that Montoya confessed to the crimes. And the prosecution presented evidence that a Denver Broncos jacket found at the scene, along with a

---

[21] *See* Brandon L. Garrett, *DNA and Due Process*, 78 Fordham L. Rev. 2929, 2931 n.97 (2010) (noting this occurred in 65 of the first 250 postconviction DNA exonerations).

[22] *Lorenzo Montoya*, NRE, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=444 6.

pair of boots that matched bloody boot prints at the scene, belonged to Montoya. The court of appeals affirmed Montoya's convictions, finding that the evidence against him was "overwhelming." *People v. Montoya*, No. 00CA2236, slip op. at 8 (Colo. App. Feb. 26, 2004) (unpublished pursuant to C.A.R. 35(f)) (available at https://research.coloradojudicial.gov/en/vid/1042628814).

It was not until the Center for Juvenile Justice got involved that Montoya had any hope of redemption. Montoya's counsel filed a habeas petition and obtained DNA testing. The test results were negative for Montoya's DNA and revealed that Montoya's two cousins' DNA profiles were on the jacket and the boots. Montoya's convictions were vacated and the charges were dismissed. After serving thirteen years in prison, Montoya was finally released.

### b.    Robert Dewey[23]

Robert Dewey was convicted for the sexual assault and murder of a young woman in Palisade. *People v. Thames*, 2015 CO 18, ¶ 2. The police arrested him after early-generation DNA testing indicated the victim's blood was on his shirt and his DNA could have been present at the crime scene. *People v. Thames*, 2019 COA

---

[23]        *Robert              Dewey*,              NRE, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3910.

124, ¶¶ 1, 7. In addition to the forensic evidence, overwhelming circumstantial evidence implicated Dewey. *Id.*, ¶ 20. Dewey filed a pro se petition for postconviction DNA testing; however, without appointing counsel or holding a hearing, the trial and appellate courts rejected his petition.

Through extraordinary measures taken outside the court system, Dewey was able to prove his innocence. Serendipitously, the Innocence Project took Dewey's case. With its assistance, extracts from Dewey's shirt were retested, revealing that the blood on the shirt belonged to Dewey, not the victim. Against all odds, Dewey's attorneys then persuaded the Colorado Justice Review Project to conduct additional DNA testing on evidence held in police custody.[24] The same genetic profile was found on the ligature from the victim's neck, beneath her fingernails, on soap bars retrieved from her vagina, and in semen on her blanket. *Id.*, ¶ 63. The profile was run on CODIS and matched the profile of Douglas Thames, who was serving a life sentence for similar crimes.[25] Dewey was exonerated and Thames was convicted of rape and murder. *Id.*, ¶ 3.

---

[24] Colo. Just. Rev. Project, *Final Report*, 11-13 (2012) (reviewing 4,967 cases before Dewey's).

[25] Jessica Fender, *Exonerated: DNA Clears Robert Dewey of a 1996 Conviction for a Murder He Didn't Commit*, 2012 WLNR 30118142, Denv. Post (May 1, 2012).

These examples illustrate the substantial risk and irreparable harm of wrongful convictions based on inadequate legal defense and false or misleading forensic evidence. Critically for this case, these defendants only obtained justice because a diligent postconviction investigation with the assistance of counsel—an avenue that the majority's interpretation of Rule 35(c) would eviscerate—revealed these inadequacies.

### 3. Redundancy

A third and lesser-understood method of establishing innocence through DNA evidence, "redundancy," involves finding the same unknown profile on multiple items of crime scene evidence. Where the same unknown profile is found on multiple items, as opposed to one, the likelihood that the profile belongs to the perpetrator increases and is often conclusive. If that same profile belongs to someone other than the defendant, it typically follows that the defendant is innocent. At a minimum, in a case like Townsell's, where the defendant's DNA profile may have been left on evidence for an innocent reason, the redundant DNA evidence creates reasonable doubt as to the defendant's guilt. Stated differently, it undermines confidence in the conviction.

Robert Dewey's case demonstrates the power of redundancy even where evidence presented at trial appears overwhelming.[26] The fact that the same foreign DNA profile was found on the ligature, the fingernail scrapings, the soap bars, and the semen provided convincing proof of Dewey's innocence. Then, the CODIS hit on Thames provided additional proof of Dewey's innocence and allowed the prosecution to convict the true perpetrator.

In Townsell's case, the power of redundancy is equally important. In his postconviction motion, he argued that had his trial counsel "followed up with further investigation"—in other words, had the numerous untested items found at the crime scene, along with the second profile on the mask, been tested—"he would have discovered substantial evidence of defendant's exclusion despite the new DNA evidence against [him]." *Townsell*, 21CA2068, ¶ 39 (Schutz, J., dissenting).

Not only could redundant DNA profiles exist on the untested items that were worn by the robber, but such evidence could identify the true perpetrator as Townsell's estranged wife's brother, as suggested at trial. And, as is the case here, the fact that "an individual is a potential source of DNA at a crime scene, [] does not

---

[26] *See also Larry Peterson*, NRE, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3532.

necessarily mean that the person was involved in the crime."[27] In particular, the presence of Townsell's DNA on the items admitted at trial was justifiable for reasons unrelated to the robbery.

These conclusions are evident from "the motion, files, and record;" meaning, Townsell's claim has arguable merit. *See Ardolino*, 69 P.3d at 78-79 ("The defendant was entitled to an evidentiary hearing as long as the allegations of his motion, *in light of the existing record*, were not clearly insufficient to undermine confidence in the outcome of the trial . . . .") (emphasis added); *see also People v. Segura*, 2024 CO 70, ¶¶ 7, 34 (holding that where a court concludes, "based on its initial review of the motion, the record, and the file, that *at least one claim* has arguable merit," i.e., "is not frivolous," it must "grant the request for postconviction counsel"); *Silva v. People*, 156 P.3d 1164, 1168 (Colo. 2007) (holding that where a "petition is not wholly unfounded," the court must appoint postconviction counsel).

Requiring indigent pro se petitioners to specify how exculpatory DNA evidence would undermine confidence in their conviction, particularly where redundancy is at issue, runs afoul of the spirit and letter of Rule 35(c), impeding

---

[27] *DNA*, *supra* note 10, at 18, 138 (noting the defense may also choose to have items retested).

access to justice and limiting the right to effective assistance of counsel. This Court should reject this insuperable burden.

### B. Indigent Incarcerated Individuals Face Numerous Barriers in Unleashing the Power of DNA Evidence Postconviction

DNA analysis is highly technical. "Modern DNA testing can provide powerful evidence unlike anything known before." *Osborne*, 557 U.S. at 62. "At the same time, DNA testing alone does not always resolve a case." *Id.* And, nobody can accurately anticipate the results of DNA testing before it has been completed. Only after testing and analysis can the legal significance of such evidence—and its impact on the outcome of the case—be determined.

With myriad unknown possibilities, indigent pro se petitioners lacking DNA testing results find themselves in a Catch-22. Under the majority's interpretation of Rule 35(c), indigent incarcerated petitioners must obtain DNA testing in order to establish their trial counsel's failure to do so prejudiced their case. This insurmountable burden is not contemplated by Rule 35(c) and presents intolerable barriers to relief, as explained by the dissent.

First and foremost, it is universally difficult for indigent incarcerated petitioners to pursue DNA testing without the assistance of counsel. To gain access to such testing, "a litigant must be able to investigate the evidence, draft the testing motion, litigate the testing motion, negotiate and oversee the lab testing, [and]

18

understand the test results."[28] Even the first step in the process presents a nearly impossible feat for indigent petitioners to achieve from the confines of prison.[29]

Here, even assuming these hurdles could be cleared, petitioners would then have to explain how the DNA test results undermine the confidence in their conviction, including how such evidence would overcome other evidence presented at trial. Given the complexities of DNA, indigent pro se petitioners would be hard-pressed to meet that burden. Indeed, "courts have struggled in their effort to determine how [DNA evidence] should be weighed against other forms of evidence presented."[30]

It is likewise unrealistic to expect indigent pro se petitioners to artfully attack the admissibility or reliability of DNA evidence used against them at trial. Not only can DNA samples be of poor quality, minimal or insufficient quantity, or constitute a mixture of multiple persons, but numerous factors "make DNA testing in the

---

[28] *See, e.g.*, Justin Brooks & Alexander Simpson, *Blood Sugar Sex Magik: A Review of Postconviction DNA Testing Statutes and Legislative Recommendations*, 59 Drake L. Rev. 799, 833-34 (2011).

[29] *DNA*, *supra* note 10, at 154 (stating locating evidence can be the most difficult step).

[30] Jason Borenstein, *DNA in the Legal System: The Benefits Are Clear, The Problems Aren't Always*, 3 Cardozo Pub. L., Pol'y & Ethics J. 847, 849, 852-54 (2015) ("For years courts have grappled with the admissibility and reliability of nuclear DNA, which is typically looked upon as the epitome of reliable evidence.").

forensic context far more subjective than simply reporting test results."[31] Indeed, "[e]ven the most well-meaning analyst may lack essential training, contaminate a sample, or err during the testing process." *Stuart v. Alabama*, 139 S. Ct. 36, 36 (2018) (mem.) (Gorsuch, J., dissenting from denial of certiorari) (citations omitted). Worse yet, "[a] forensic analyst 'may feel pressure—or have an incentive—to alter the evidence in a manner favorable to the prosecution."[32] *Id.*

Compounding this problem, there is little, if any, chance that an indigent pro se petitioner would receive the full range of information needed to undermine the DNA evidence presented at trial, such as interpretive statements regarding a DNA profile's potential association with a known suspect, other evidence samples, databank samples, or the statistical frequency of such evidence. Laboratories also commonly maintain additional case files, including a chain of custody, sketches or photographs, examination notes, logs, and communications between those involved,

---

[31] *Id.* at 855-56 (noting that human error can result in DNA samples being corrupted, mishandled, mislabeled, or improperly sealed); Murphy, *supra* note 18, at 497.

[32] Numerous scandals have confirmed cases in which law enforcement officials and analysts have deliberately falsified or fabricated results. *See, e.g.*, Borenstein, *supra* note 30, at 856-57; Erin Murphy, *The New Forensics: Criminal Justice, False Certainty, and the Second Generation of Scientific Evidence*, 95 Calif. L. Rev. 721, 754-56 & nn.149-56 (2007).

among others.[33] While these records are critical to the analysis of a given DNA report, absent the assistance of an expert, indigent pro se petitioners cannot be expected to articulate the impact of such evidence with specificity.

What is more, requiring indigent pro se petitioners to retain a DNA expert while incarcerated—without the requisite financial means or connections—underscores why the majority's interpretation of Rule 35(c) is untenable.

These are just a few examples of issues confronting indigent pro se petitioners in specifying how exculpatory DNA evidence would have caused reasonable doubt in the minds of jurors. Even in cases where there is overwhelming evidence of guilt, like Montoya's, DNA testing has proven innocence in ways one could never predict.[34]

Finally, appointing counsel on Rule 35(c) petitions like Mr. Townsell's, where counsel inadequately investigated DNA evidence, will not open the floodgates to

---

[33] *DNA*, *supra* note 10, at 17.

[34]         *See,          e.g.,*          NRE,          *Joseph          White*,
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=373
6;                *Paul                House*,                                NRE,
https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=330
7.

frivolous petitions.[35] In many cases, DNA testing cannot create results that would undermine confidence in the convictions. For instance, DNA testing would serve no useful purpose in a sexual assault case where the petitioner concedes that he had sexual intercourse with the victim, but maintains it was consensual. Nor would DNA testing be probative in a murder case where the petitioner pled self-defense or insanity. If identity was not at issue at trial, DNA evidence is seldom relevant. In other cases, a favorable DNA result would be inconsequential if it only discredited an ancillary fact.

It is entirely unreasonable to expect indigent pro se petitioners to explain how trial counsel's failure to investigate DNA evidence prejudiced the outcome of their case. Without the assistance of counsel, basic failures to investigate cannot be corrected, faulty forensic evidence cannot be unveiled, and innocent individuals who fall prey to these deficiencies have no path to justice. Judge Schutz was right. A fair and reliable criminal process cannot countenance the profoundly unjust consequences created by the majority's Catch-22.

---

[35] Only three DNA exonerees are from Colorado. The third, Timothy Masters, was convicted of murder in 1987. *Timothy Masters*, NRE, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3412. After raising IAC claims, Masters gained access to DNA testing that revealed another suspect's DNA profile. Had Masters not been appointed postconviction counsel, he would still be in prison.

This Court should protect indigent pro se petitioners' right to effective assistance of counsel and, in turn, against the risk of wrongful convictions in situations where trial counsel failed to investigate DNA evidence—cases that are uniquely susceptible to result in prejudice.

## CONCLUSION

For the foregoing reasons, the Court should reverse the division's decision, answer the issue that is the subject of this brief with a resounding no, and remand the case to the district court with instructions to appoint Townsell postconviction counsel.

Respectfully submitted on this 16th day of December, 2024.

WHEELER TRIGG O'DONNELL LLP

*s/ Nicole L. Jones*
Clarissa M. Collier, #40374
Nicole L. Jones, #51382

*Attorneys for Amicus Curiae Korey Wise Innocence Project*

23

## CERTIFICATE OF SERVICE

I certify that on December 16, 2024, a true and correct copy of **BRIEF OF *AMICUS CURIAE* KOREY WISE INNOCENCE PROJECT IN SUPPORT OF PETITIONER JAMALE D. TOWNSELL** was filed with the Court via Colorado Courts E-Filing System, with e-service to the following:

Krista A. Schelhaas (Alternate Defense Counsel)   ( ) First Class Mail
Schelhaas Law LLC   ( ) Hand Delivery
PO Box 621355   ( ) Facsimile
Littleton, CO 80162   ( ) Overnight Delivery
Telephone: 303.803.4750   (X) Colorado Courts E-Filing
Email: kschelhaas@comcast.net   ( ) E-Mail

*Attorney for Petitioner Jamale D. Townsell*

Hollis Ann Whitson   ( ) First Class Mail
Samler & Whitson P.C.   ( ) Hand Delivery
1600 Stout St. Suite 1400   ( ) Facsimile
Denver Colorado, 80202   ( ) Overnight Delivery
Telephone: 303.670.0575   (X) Colorado Courts E-Filing
Email: hollis.whitson@gmail.com   ( ) E-Mail

*Attorney for Petitioner Jamale D. Townsell*

John T. Lee,   ( ) First Class Mail
Office of the Attorney General   ( ) Hand Delivery
Criminal Appeals Section   ( ) Facsimile
Ralph L Carr Colorado Judicial Center   ( ) Overnight Delivery
1300 Broadway 10th Floor   (X) Colorado Courts E-Filing
Denver, CO 80203   ( ) E-Mail
Telephone: 720.508.6000
Email: john.lee@coag.gov

*Attorney for The People of the State of Colorado*

s/ Ben Marquez

24